[Cite as *T.H. v. N.H.*, 2021-Ohio-217.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

[T.H.],                                                    :

    Plaintiff-Appellant,               :

                                                 No. 19AP-747

v.                                                         :              (C.P.C. No. 16JU-11649)

[N.H.],                                                   :            (REGULAR CALENDAR)

    Defendant-Appellee.              :

---

D E C I S I O N

Rendered on January 28, 2021

---

**On brief:** *Baker & Wick, LLC, Kelly M. Wick*, and *Amanda C. Baker*, for appellant. **Argued:** *Amanda C. Baker*.

**On brief:** *Carpenter Family Law LLC,* and *Kendra L. Carpenter*, for appellee. **Argued:** *Kendra L. Carpenter*.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, P.J.

{¶ 1} Plaintiff-appellant, T.H., appeals from the October 1, 2019 decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch. For the following reasons, we reverse.

## I. Facts and Procedural History

{¶ 2} On September 29, 2016, T.H. filed a complaint against defendant-appellee, N.H., for shared custody of three children, J.C.H., J.M.H., and S.G.H. (collectively, "the children").[1] In her complaint, T.H. also sought interim orders concerning the care of the children. The record does not reflect that N.H. filed an answer to T.H.'s September 29, 2016 complaint. On October 16, 2016, the juvenile court appointed Laura M. Peterman as

---

[1] We note that in a separate matter, T.H. filed on May 27, 2016 for divorce from N.H.

guardian ad litem for the children. On November 22, 2016, T.H. filed a motion for temporary orders allocating rights and responsibilities of the parties for the care of the children.

{¶ 3} On December 19 and 20, 2016, the juvenile court magistrate filed two agreed temporary custody orders. On February 16, 2017, the juvenile court magistrate held a hearing on the motion for temporary orders. On April 24, 2017, the juvenile court magistrate filed a temporary order regarding child support and expenses related to the care of the children. On May 4, 2017, T.H. filed a motion to set aside the magistrate's April 24, 2017 temporary order. On November 27, 2017, the guardian ad litem filed a report.

{¶ 4} On December 4, 2017, the juvenile court began hearings on T.H.'s complaint for custody. T.H. testified she and N.H. began their relationship in 2002. In late 2002, although marriage was not legally recognized for same-sex couples in Ohio, T.H. and N.H. became engaged. In 2003, they jointly decided to have children. Around that time, they purchased a home in Columbus (the "residence"). N.H. legally changed her last name to match T.H.'s in 2012, although she had informally used that last name to refer to herself prior to that date. T.H. and N.H. also used T.H.'s last name to refer to the family as a whole, including the children. T.H. and N.H. officially married on August 10, 2015, less than two months after marriage for same-sex couples was legally recognized nationwide pursuant to the United States Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. 644 (2015).

{¶ 5} Before J.C.H. and J.M.H. were born, T.H. and N.H. discussed how to handle custody of the children in the event they ever separated. According to T.H., she and N.H. agreed they would split custody of the children "50/50." (Tr. Vol. I at 40.) In order to give effect to this understanding, on July 18, 2005, prior to the birth of J.C.H. and J.M.H., T.H. and N.H. signed a co-parenting agreement, which was notarized and signed by two witnesses.

{¶ 6} In the co-parenting agreement, T.H. and N.H. specified their understanding of their rights and responsibilities during the course of their relationship regarding any future children they would have, as well as their intentions in the event their relationship ended. Throughout the agreement, T.H. and N.H. described any future children as "our child/children." (Pltf.'s Ex. 2 at 1.) T.H. and N.H. agreed to jointly and equally share parental responsibility, providing support and guidance to the children. They agreed to give the children T.H.'s last name and provided that the "child's/children's first and middle

name(s) will be determined by our mutual consent." (Pltf.'s Ex. 2 at 2.) In the event of their separation, they agreed to "make a good-faith effort to jointly make all major decisions affecting our child's/children's health and welfare, and all decisions will be based upon the best interests of our child/children." (Pltf.'s Ex. 2 at 3.) Furthermore, they agreed they would "share in our child's/children's upbringing and will share in our child's/children's support, depending on our needs, our child's/children's needs and on our respective abilities to pay." (Pltf.'s Ex. 2 at 3.)

{¶ 7} On July 18, 2005, N.H. executed a durable power of attorney for medical authorization through which she gave T.H. equal power to make medical decisions for the children, consistent with the terms of the co-parenting agreement. On the same date, N.H. executed a last will and testament in which she provided that T.H. would have full custody of the children in the event of N.H.'s death, consistent with the terms of the co-parenting agreement.

{¶ 8} T.H. testified that, following their decision to have children in 2003, she and N.H. jointly decided N.H. would carry the children because T.H. had a history of smoking and was older than N.H. T.H. and N.H. jointly selected a donor whose physical characteristics closely resembled T.H.'s.

{¶ 9} T.H. testified she assisted in the procedure for artificial insemination for the children. T.H. was present for most of the doctor's appointments related to the artificial insemination and was present in the hospital when all the children were born.

{¶ 10} In 2005, N.H. delivered twins, J.C.H. and J.M.H., using her own eggs and the donor sperm she and T.H. selected. According to T.H., N.H. attempted to put T.H.'s name as a parent on J.C.H. and J.M.H.'s birth certificates, but was prevented from doing so because same-sex parents were not legally recognized at that time. While N.H. recovered from giving birth to J.C.H. and J.M.H., T.H. stayed at the hospital for approximately three days, during which time she fed J.C.H. and J.M.H. and changed their diapers. While she was in the hospital, T.H. had a wristband that identified her as J.C.H. and J.M.H.'s parent. In the program for the baptism of J.C.H. and J.M.H., both N.H. and T.H. were listed as parents. Furthermore, in the newspaper announcement for the birth of J.C.H. and J.M.H., both T.H. and N.H. were listed as parents.

{¶ 11} When J.C.H. and J.M.H. were born, N.H. worked as a schoolteacher, requiring her to be out of the house during regular weekday hours. T.H. worked on nights

and weekends. T.H. stayed at home with J.C.H. and J.M.H. during the day while N.H. worked.

{¶ 12} In 2010, N.H. gave birth to another child, S.G.H., using the same donor sperm. According to T.H., in 2011, following the birth of S.G.H., N.H. gave T.H. an ultimatum, demanding that T.H. quit her job in order to spend more time with the family. In July 2011, T.H. quit her job to stay at home with the children full-time. Around the same time, T.H. started babysitting additional children in order to make extra money.

{¶ 13} At the hearing, T.H. described in great detail the children's daily activities, including their meals, sports commitments, and relationships with friends. T.H. was generally responsible for taking J.C.H. to sporting events. T.H. had coached J.C.H. and J.M.H.'s soccer team alongside N.H.

{¶ 14} T.H. testified she and N.H. shared responsibility for parenting the children for their entire lives. According to T.H., she spent more parenting time with the children. However, T.H. stated she and N.H. were equal parents to the children. T.H. testified there were never any restrictions on her ability to parent the children, including with regard to education and medical decisions. Even when they disagreed, they were able to jointly reach decisions for the children. In T.H.'s experience, N.H. never indicated she was the sole custodial parent of the children or that she would solely make decisions regarding the children's care because she was the biological parent.

{¶ 15} T.H. testified the children's school recognized both T.H. and N.H. as the children's parents. However, T.H. was listed as the main contact for the children at their school. When she and N.H. interacted with the children's teachers and school administrators, both T.H. and N.H. were equally recognized as the children's mothers, and there was no distinction in how they were treated. According to T.H., N.H. never indicated to anyone at the children's school that she was the birth mother or sole custodian of the children.

{¶ 16} T.H. and N.H. would both try to be present for the children's medical appointments, although there were some instances where one or the other would not be available. T.H. was listed on all of the children's emergency contact forms as a parent.

{¶ 17} T.H. believed the children were bonded with both her and N.H. The children had a good relationship with one another. The children wrote both T.H. and N.H. cards for Mother's Day. The children call T.H. "Mutti," which is a German word for "mother." (Tr.

Vol. I at 74.) The children called T.H.'s parents "grandma" and "grandpa," and called N.H.'s parents "nana" and "papa." (Tr. Vol. I at 127-28.)

{¶ 18} According to T.H., in May 2016, when T.H. returned home to the residence from one of the children's sporting events in Cincinnati, N.H. informed T.H. that she was leaving the house for the next five days. When T.H. entered the house with the children, she discovered N.H. had already moved some of her belongings out of the house. Prior to that point, T.H. had been completely unaware that N.H. planned on moving. For approximately three months after she first moved out, N.H. would leave the house for two to three days at a time, occasionally returning after work to sleep at the house. During that time, N.H. left the children with T.H., who provided for them in N.H.'s absence.

{¶ 19} T.H. testified that, after the three months of intermittently returning to the residence, N.H. moved out of the house and into her own apartment in Columbus. Since that time, T.H. and N.H. split custody of the children on a rotating schedule of two days with one parent, two days with the other, and three days back with the first parent. Although there were some issues with the schedule, T.H. desired equal parenting time with the children.

{¶ 20} C.G. testified she was the next door neighbor of T.H. and N.H. when they lived at the residence. C.G. had known T.H. since the early 1990s and N.H. for over 15 years. C.G. witnessed N.H. and T.H. sign the co-parenting agreement. C.G. recalled that N.H. and T.H. expressed they were entering into the co-parenting agreement to ensure that T.H. had equal rights to the children. C.G. did not recall either party ever expressing that they did not want the other to be an equal parent to the children. C.G. never questioned that the children were equally N.H. and T.H.'s. According to C.G., both N.H. and T.H. made decisions about the children. C.G. testified the children considered both N.H. and T.H. to be their parents.

{¶ 21} M.M. testified she lived with C.G. and was the next door neighbor of N.H. and T.H. when they lived together at the residence. M.M. had known N.H. and T.H. for approximately 13 years. M.M. had a close relationship with the children, who called her "aunt." (Tr. Vol. III at 243.) M.M. testified the children considered both N.H. and T.H. to be their mothers. According to M.M., there was never a question that the children were equally T.H. and N.H.'s. Both N.H. and T.H. made decisions about the children.

{¶ 22} S.H., T.H.'s mother, testified the children call her "grandma." (Tr. Vol. III at 262.) N.H. recognized S.H. as the children's grandmother from the time of their birth. It

was S.H.'s understanding that T.H. and N.H. intended to have equal rights to the children. Both T.H. and N.H. made decisions for the children. S.H. testified the children considered both T.H. and N.H. to be their mothers.

{¶ 23} N.H., who was not represented by counsel at the hearing, testified it was her belief she was the sole legal custodian of the children. According to N.H., she selected the sperm donor for the children because the donor had qualities that were important to her. She alone paid for the entirety of the artificial insemination process. She made all medical, educational, religious, and healthcare decisions for the children.

{¶ 24} N.H. testified that her name alone appeared on the children's birth certificates and that she was listed as the biological parent in the co-parenting agreement. It was her intention in executing the co-parenting agreement, her will, and durable power of attorney for medical authorization to provide a custodian for the children in the event of her death. She did not intend to relinquish sole custody of the children by executing any of the agreements.

{¶ 25} N.H. testified that the only joint purchase she ever made with T.H. was for the residence. She and T.H. held all of their finances separately, including checking accounts, credit cards, and savings accounts. N.H. paid all the bills for the residence. According to N.H., all the responsibilities, including maintaining the home, raising the children, and paying the expenses related to childcare, were hers alone.

{¶ 26} N.H. testified she was responsible for the following activities for the children: arranging play dates; scheduling birthday parties; arranging and attending medical appointments; arranging, attending, and facilitating transportation to extracurricular activities; and shopping for clothes. N.H. was the volunteer soccer coach for J.C.H. and J.M.H. N.H. scheduled and attended every parent-teacher conference for the children.

{¶ 27} N.H. acknowledged she had been in a relationship with T.H. According to N.H., she and T.H. "both did strive to be loving, supportive, and caring for each child." (Tr. Vol. III at 392.) Both N.H. and T.H. were responsible for disciplining the children. However, N.H. also stated she made all major decisions about the care of the children.

{¶ 28} On cross-examination, N.H. acknowledged T.H. was a parent of the children, both in practice and as specified in the co-parenting agreement. N.H. acknowledged that the co-parenting agreement specified that T.H. and N.H. would "jointly and equally share parental responsibility, with both of us providing support and guidance to our

child/children." (Tr. Vol. III at 412.) N.H. acknowledged the co-parenting agreement specified the rights of the parties to parent the children while N.H. was alive, instead of providing for T.H.'s rights only in the event of N.H.'s death, as she earlier claimed. N.H. signed a durable power of attorney for medical authorization giving T.H. equal power to make medical decisions for the children from July 18, 2005, before the birth of the children, until December 11, 2017, after the initial day of testimony in the custody hearing, when she stated she revoked such power of attorney.

{¶ 29} N.H. agreed it was a joint decision between her and T.H. to have the children. N.H. testified she gave J.C.H. and J.M.H. T.H.'s last name in 2005 when they were born, although N.H. did not legally change her last name until 2012. According to N.H., the children considered T.H. a parent and called her "Mom" or "Mutti." (Tr. Vol. IV at 410-11.) N.H. agreed that the newspaper announcement listing the birth of J.C.H. and J.M.H. specified that both N.H. and T.H. were listed as parents. Additionally, the program for the baptism of J.C.H. and J.M.H. listed both N.H. and T.H. as parents.

{¶ 30} N.H. acknowledged that she testified in her deposition both she and T.H. researched and decided on a sperm donor for the children. N.H. acknowledged T.H. paid the property taxes for the residence. N.H. acknowledged that she testified in her deposition T.H. paid for the furniture in the house. N.H. admitted that some of the expenses for the children were paid by T.H. N.H. admitted she and T.H. split payments for the children's school lunches. T.H. paid half of the children's tuition for the previous year.

{¶ 31} N.H. admitted it was not accurate to say that she alone was responsible for the household or yard work. N.H. acknowledged that at her deposition, when asked "Do you believe that on a legal or a rights basis to the [children] you agree that you both are equal parents to the [children]," she responded, "I believe we, yes [sic]." (Tr. Vol. IV at 454-55.)

{¶ 32} N.H. admitted that in accordance with the co-parenting agreement, "[T.H.] was very active in the [children's] lives, helped raise the children, took them places, attended conferences, preschool, I mean, very active in their lives." (Tr. Vol. IV at 456.) N.H. acknowledged that T.H. was home with the children full-time after 2011, including caring for S.G.H. while J.C.H. and J.M.H. were at school and N.H. was at work. N.H. acknowledged the children were equally bonded with her and T.H., as contemplated by the co-parenting agreement. N.H. testified it was not her intent in revoking the medical power

of attorney to remove T.H.'s ability to get medical treatment for the children, but only to remove T.H.'s ability to make medical decisions on N.H.'s behalf.

{¶ 33} Peterman, the children's guardian ad litem, testified T.H. and N.H. did not have issues with sharing responsibility over the children during the pendency of the case. Both parties were agreeable to sharing equal custody and parental rights. The main issues prior to the custody hearing were the specific division of parenting time and responsibility for taking one of the children to sporting events. During her time as guardian ad litem, N.H. never expressed to Peterman that she desired sole custody of the children. Indeed, it was not until the custody hearing itself that Peterman learned N.H. sought sole custody of the children. When Peterman met with the parties on September 14, 2017, less than three months before the custody hearing, both N.H. and T.H. were agreeable to Peterman's recommendation that both parties should have equal access and rights to the children.

{¶ 34} Peterman testified the children considered T.H. to be their mother. The children considered T.H. and N.H. to be equal parents. Based on her experience with T.H., N.H., and the children, Peterman recommended that custody be shared between T.H. and N.H. Furthermore, Peterman stated it would negatively impact the children if T.H. was not awarded equal custody.

{¶ 35} On May 7, 2018, N.H. filed a motion to terminate the April 24, 2017 temporary order. On October 4, 2018, the parties filed joint stipulations, in which they agreed to a parenting schedule, communication protocol, and other rights and responsibilities regarding the children's care. Certain issues, including child support, expenses, and insurance were explicitly not resolved by the parties in the joint stipulations.

{¶ 36} On July 23, 2019, the juvenile court filed an agreed judgment entry incorporating all temporary orders. In the agreed judgment entry, the juvenile court ordered N.H. to pay child support and maintain health insurance for the children. The juvenile court reserved determination of any custody issues not addressed by the October 4, 2018 joint stipulations. Also on July 23, 2019, the trial court filed an agreed journal entry and findings of fact in which the trial court ordered a deviation in the amount of child support paid by N.H.

{¶ 37} On October 1, 2019, the juvenile court filed a decision and judgment entry "grant[ing] in part" T.H.'s complaint for custody and incorporating the October 4, 2018 joint stipulations. (Decision at 13.) In its decision, the juvenile court designated N.H. as

the sole legal custodian of the children. The court further provided that N.H. was the residential parent for school placement and the final decisionmaker as to the health and well-being of the children.

## II.  Assignments of Error

{¶ 38} T.H. appeals and assigns the following three errors for our review:

> I. The Trial Court Erred When It Found That [N.H.] did Not Relinquish Sole Custody in Favor of Co-Custody with [T.H.] Because Its Decision is Not Supported by Competent Credible Evidence and it is Against the Manifest Weight of the Evidence.
>
> II. The Trial Court Abused Its Discretion and Erred as a Matter of Law When it Misapplied the Facts and the Legal Test to Determine Whether [N.H.] Relinquished Sole Custody in Favor of Shared Custody with [T.H.].
>
> III. The Trial Court Erred When It Used the Wrong Filing Date in Incorporating the Parties' Join Stipulations Filed October 4, 2018 into Its Decision and When It Did Not Incorporate the Parties' July 23, 2019 Agreed Entry.

## III.  Applicable Law

{¶ 39} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child[ren]." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). *See Rowell v. Smith*, 10th Dist. No. 12AP-802, 2013-Ohio-2216, ¶ 27, citing *In re Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, ¶ 11 ("It is without question that parents have a constitutionally protected due process right to make decisions concerning the care, custody, and control of their children, and the parents' right to custody of their children is paramount to any custodial interest in the children asserted by nonparents.").

{¶ 40} However, the right of a parent to make decisions concerning the care, custody, and control of his or her children is not without limits. R.C. 3111.01(A) provides that "[a]s used in sections 3111.01 to 3111.85 of the Revised Code, 'parent and child

relationship' means the legal relationship that exists between a child and the child's natural or adoptive parents and upon which those sections and any other provision of the Revised Code confer or impose rights, privileges, duties, and obligations." R.C. 3111.01(B) provides that "[t]he parent and child relationship extends equally to all children and all parents, regardless of the marital status of the parents." In construing R.C. 3111.01 in conjunction with R.C. 3111.04, in 2011 the Supreme Court of Ohio affirmed that "Ohio does not recognize a parent's attempt to enter into a statutory 'shared parenting' arrangement with a nonparent, same-sex partner because the nonparent does not fall within the definition of 'parent.' " *Mullen* at ¶ 11, citing *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, ¶ 35.

{¶ 41} Nonetheless, Ohio does recognize a parent's ability to "voluntarily share with a nonparent the care, custody, and control of his or her child through a valid shared-custody agreement." *Rowell* at ¶ 27, citing *Mullen* at ¶ 11, citing *Bonfield* at ¶ 50, and R.C. 2151.23(A)(2). "A shared-custody agreement recognizes the general principle that a parent can grant custody rights to a nonparent and will be bound by the agreement." *Mullen* at ¶ 11, citing *Bonfield* at ¶ 48, citing *Masitto v. Masitto*, 22 Ohio St.3d 63, 65 (1986). A parent may enter into such a voluntary custody sharing agreement through words and conduct. *Id. See In re G.R.-Z.*, 9th Dist. No. 28316, 2017-Ohio-8393, ¶ 8; *In re L.J.R.*, 7th Dist. No. 14 CO 37, 2015-Ohio-1198, ¶ 55; *Brown v. Wyandt*, 3d Dist. No. 8-13-08, 2014-Ohio-164, ¶ 35. "A valid shared-custody agreement is reviewed by the juvenile court and is an enforceable contract subject only to the court's determinations that the custodian is 'a proper person to assume the care, training, and education of the child' and that the shared-legal-custody arrangement is in the best interests of the child[ren]." *Mullen* at ¶ 11, quoting *Bonfield* at ¶ 48, 50.

{¶ 42} In *Mullen*, the Supreme Court considered a custody dispute over a minor child between Kelly Mullen, the child's biological parent, and Michele Hobbs, Mullen's former romantic partner. Specifically, the court considered whether Mullen, by her conduct with Hobbs, entered into an agreement through which Mullen permanently relinquished sole custody of the child in favor of shared custody with Hobbs.

{¶ 43} In the trial court, the juvenile court judge concluded a preponderance of the evidence did not conclusively demonstrate that Mullen's conduct created a contract that permanently gave partial custodial rights over the child to Hobbs. While the juvenile court found there was strong evidence that Mullen had intended to give Hobbs shared custody,

it also found persuasive the testimony from Mullen and others that Mullen had never intended for Hobbs to share in the child's legal custody. Furthermore, the juvenile court relied on the fact that Mullen had repeatedly refused to enter into a legally enforceable shared-custody agreement with Hobbs when presented with the option to do so. Finally, the court also considered the involvement of the child's biological father, who was listed on the birth certificate, acknowledged paternity, and maintained a consistent presence in the child's life.  On appeal, the court of appeals, noting strong evidence supported both Mullen and Hobbs' positions, affirmed the juvenile court's decision as it was supported by competent, credible evidence.

{¶ 44} The Supreme Court affirmed the decisions of the court of appeals and the juvenile court.  The Supreme Court found the record reflected there was some evidence indicating that Mullen had intended to share custody of the child, but also there was contrary evidence indicating that Mullen did not agree to permanently cede partial legal custody rights to Hobbs. The court specifically recognized, consistent with its prior decisions, that courts "have not required a parent to create a written contract to relinquish custody rights." *Mullen* at ¶ 21. Nevertheless, the court noted that "the best way to safeguard both a parent's and a nonparent's rights with respect to children is to agree in writing as to how custody is to be shared, the manner in which it is shared, and the degree to which it may be revocable or permanent, or to apply to a juvenile court for an order under R.C. 2151.23(A)(2) establishing the scope of the legal custody that the parent desires to share, or both."  *Id.*  Furthermore, the court found the term "coparent" did not equate to "shared legal custody," but also found that "[t]he parties' use of the term [coparenting], together with other evidence, however, may indicate that the parties shared the same understanding of its meaning and may be considered by the trial court in weighing all the evidence."  *Id.* at ¶ 22.

{¶ 45} In *Rowell*, we addressed a custody dispute over a minor child between Julie Smith, the child's biological parent, and Julie Rowell, Smith's former romantic partner. In that case, there was conflicting testimony between the parties on almost every fact other than the general timeframe and the place in which the parties met. The juvenile court, however, found that Smith's testimony was "not compelling and often patently unbelievable." *Rowell* at ¶ 53. The juvenile court granted the petition for shared custody finding that Smith's conduct constituted a contractual relinquishment of her custody rights

and in finding shared custody was in the child's best interest. On appeal, Smith contended that her temporary sharing of custodial responsibilities with a non-parent is not sufficient to establish she entered into a valid shared custody agreement. Smith contended that because she did not execute any legal documents such as a power of attorney, guardianship, or will giving Rowell any rights to the child, the record lacked any evidence that Smith permanently intended to relinquish her exclusive custodial rights to the child. We disagreed finding the record contained some reliable, credible evidence to support the juvenile court's determination that Smith, "through words and conduct," agreed to share legal custody with Rowell. *Id.* at ¶ 54.

## IV. Evidentiary Standards and Standard of Review

{¶ 46} Generally, "[a] trial court has broad discretion in proceedings involving the care and custody of children." *Mullen* at ¶ 14. "Whether a parent has voluntarily relinquished the right to custody is a factual question to be proven by a preponderance of the evidence." *Id.* Similarly, "whether a parent, through words and conduct, has agreed to share legal custody with a nonparent is also a question of fact." *Id.*

{¶ 47} "[T]he determination of whether a 'parent relinquishes rights to custody is a question of fact which, once determined, will be upheld on appeal if there is some reliable, credible evidence to support the finding.' " *Mullen* at ¶ 15, quoting *Masitto* at 66. "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." *Bechtol v. Bechtol*, 49 Ohio St.3d 21 (1990), syllabus. Where the juvenile court's determination is "supported by the evidence and [is] not clearly against the manifest weight of the evidence," a reviewing court "must affirm." *Mullen* at ¶ 23.

{¶ 48} Following the decision in *Mullen*, the Supreme Court clarified the standard for reviewing manifest weight challenges in *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis omitted.) *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "The phrase 'some competent, credible evidence' * * * presupposes evidentiary weighing by an appellate court to determine whether the evidence is competent and credible." *Id.* at ¶ 15.

Thus, in reviewing a judgment under the manifest weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20. Under this standard, a court of appeals must make every reasonable presumption in favor of the juvenile court's findings of fact and judgment. *Id.* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3.

{¶ 49} " 'Whether the trial court applied the correct legal standard is a legal issue that we review de novo.' " *E.W. v. T.W.*, 10th Dist. No. 16AP-88, 2017-Ohio-8504, ¶ 13, quoting *Martin v. Mahr Machine Rebuilding, Inc.*, 11th Dist. No. 2015-L-101, 2017-Ohio-1101, ¶ 4. *See Bruns v. Green*, 10th Dist. No. 18AP-259, 2019-Ohio-2296, ¶ 8 (applying a de novo standard of review and noting that "[a]lthough a trial court has broad discretion in deciding a custody matter," it must follow the applicable legal standards).

## V.  First and Second Assignments of Error

{¶ 50} In her first and second assignments of error, T.H. asserts the trial court erred by finding N.H. did not relinquish sole custody of the children. T.H. contends the trial court's decision is not supported by competent, credible evidence and is against the manifest weight of the evidence.

{¶ 51} In its decision, the juvenile court cited to *Mullen* in recognizing that "one way to determine if a nonparent has custody rights is to determine if the parent has entered [into] an agreement by word or conduct to voluntarily relinquished [sic] sole legal custody in favor of shared custody with the nonparent." (Decision at 3, citing *Mullen* at ¶ 14.) The court analyzed the question of whether N.H. voluntarily relinquished sole custody of the children by examining evidence related to three factors: (1) participation in planning for the birth of the children, (2) documents regarding the care and custody of the children, and (3) the everyday operation of the parties.

{¶ 52} First, the juvenile court analyzed T.H. and N.H.'s participation in planning for the birth of the children. The trial court found T.H. played a "significant role in the planning [for] and birth of the children." (Decision at 4.) The court noted the differences between T.H. and N.H.'s testimony. However, the court cast doubt on N.H.'s testimony by noting that, at the time of the births of J.C.H. and J.M.H., the parties had been in a

committed relationship for several years and had purchased a home together. Additionally, at the time of the birth of S.G.H., the court noted the parties had been in a committed relationship for seven years. It was undisputed that T.H. was in the delivery room for the births of the children and participated in naming the children. Furthermore, the court found "persuasive in this case * * * that [N.H.] listed [T.H.'s] last name * * * as the children's last name on their birth certificates" and had not indicated whether she planned to change the children's last name. (Decision at 4.)

{¶ 53} Second, the juvenile court examined documents related to the care and custody of the children. With regard to the co-parenting agreement, the court stated:

> The co-parenting agreement signed by the Parties is not legally enforceable. As stated above, Ohio does not recognize shared parenting agreements between same-sex couples because the non-biological partner does not meet the definition of a parent under the current statutes. [N.H.] did not intend to voluntarily relinquish her sole custody rights in favor of co-custody with [T.H.].

(Decision at 5.) Nevertheless, the court noted the document was provided to the children's school, stated that all decisions regarding "the health[,] education[,] and custody of the children were to be made jointly," and gave each party joint and equal responsibility for the children in the event of separation. (Decision at 5.) Despite finding the co-parenting agreement to be legally unenforceable, the court found "the Parties did enter the agreement with the intent to abide by the agreement." (Decision at 5.)

{¶ 54} Additionally, the court found the parties had executed durable medical powers of attorney providing them each with the ability to make medical decisions for the children. The court found N.H. had revoked the medical power of attorney on the day before the custody hearing,[2] though it noted N.H.'s testimony that she had not intended to revoke T.H.'s ability to get medical treatment for the children. The court also found N.H., in her last will and testament, named T.H. as guardian and sole custodian of the children and beneficiary of N.H.'s will. The court found it was unclear as to whether N.H. had modified or revoked her will.

{¶ 55} Next, the court found T.H. did not attempt to adopt the children, despite being married to N.H. since 2015. The court noted the only testimony on the subject was

---

[2] We note that N.H. testified she revoked the agreement effective December 11, 2017, after the custody hearing began December 4, 2017.

T.H.'s, who stated that the parties jointly decided they did not need to pursue adoption. The court found that N.H. "did not express whether she was for or against step-parent adoption, but her inaction can be considered as a denial of an extension of the agreement." (Decision at 6.)

{¶ 56} Finally, considering the everyday operation of the parties, the court found that "[s]imilar to *Rowell*, the Parties operated as joint custodians." (Decision at 6.) The court found, according to the testimony of both N.H. and T.H., the parties jointly made decisions regarding the children's education, daycare, health, and extracurricular activities. N.H. and T.H. "shared in the responsibility of taking care of the children" by jointly paying for the children's expenses, in addition to "exercis[ing] their authority separately" in taking the children to appointments.  (Decision at 6.)

{¶ 57} The court noted N.H. had not been found to be unsuitable or unfit to parent the children. Ultimately, the juvenile court concluded its analysis by finding that T.H. "knew that no legal protection as a custodian could be gained without a court order. Based upon the rules of the Court, the agreement had to be acknowledged before a judicial officer to be valid." (Decision at 7.)  Finding that, pursuant to *Mullen*, "co-parent does not equal shared legal custody," the juvenile court stated it "will not go outside the legal document to find that co-parenting means shared legal custody." (Decision at 9.)

{¶ 58} We find the juvenile court erred in two material respects: first, it erred in its application of controlling precedent; second, we find the court's judgment was against the manifest weight of the evidence.  First, with regard to the juvenile court's analysis, the court improperly found that T.H. "knew that no legal protection as a custodian could be gained without a court order" and that any "agreement had to be acknowledged before a judicial officer to be valid." (Decision at 7.)  This is a misstatement of the law under *Mullen* and *Rowell*.  In *Mullen*, the Supreme Court confirmed that "a parent, through words and conduct" can "agree[] to share legal custody with a nonparent."  *Id.* at ¶ 14. In *Rowell*, we affirmed the juvenile court's finding that the biological parent had, through her words and actions alone, agreed to share legal custody with a non-parent, even in the absence of any legal documents such as a power of attorney, guardianship or will giving Rowell any rights to the child.  *See Rowell* at ¶ 54.

{¶ 59} Contrary to the trial court's findings, no court order is required in order for a parent to demonstrate through their words and conduct that they manifested an agreement

to share legal custody with a non-parent. Although the Supreme Court has found that " '[c]oparenting' is not synonymous with an agreement by the biological parent to permanently relinquish sole custody in favor of shared legal parenting," it has found that "[t]he parties' use of the term, together with other evidence, however, may indicate that the parties shared the same understanding of its meaning and may be considered by the trial court in weighing all the evidence." *Mullen* at ¶ 22. Furthermore, it is unclear how the juvenile court's statements regarding the requirement of a court order fit with its finding that "[s]imilar to *Rowell*, the Parties operated as joint custodians," as there was no custody agreement acknowledged before a court in that case. (Decision at 6.)

{¶ 60} Next, we address the juvenile court's consideration of T.H.'s decision to stay at home with the children while earning some additional income as a childcare provider for other families. The juvenile court stated it "considered whether the prudent parent would find an alternative means to attempt to assist the soon to be ex-spouse in maintaining the home for the children." In answering this question, the court concluded that "as a spouse, [T.H.] should have assisted [N.H.] in meeting obligations in the best interest of the children." (Decision at 8.) It is unclear from the juvenile court's decision as to what weight, if any, the court gave this finding. However, it is also unclear as to why this finding is relevant to the determination of whether N.H., by her words and conduct, entered into a shared custody agreement with T.H.

{¶ 61} Furthermore, it is unclear from the trial court's decision why it considered whether N.H. had been found to be "unsuitable or unfit to parent her children," as this is not a requirement for entering into a shared custody agreement. (Decision at 8.) *Mullen* provides that "[i]f there is such a contract [to share legal custody], *then* the juvenile court must engage in a 'suitability' and 'best interests' analysis." (Emphasis added.) *Id.* at ¶ 12. However, suitability is not a factor for the determination of whether the parties had an agreement to share legal custody. Thus, although the juvenile court prefaced its analysis with the correct standard in *Mullen*, the decision does not reflect that the court properly considered whether N.H., through her words and conduct, created an agreement to permanently relinquish sole legal custody of the children in favor of shared legal custody with T.H. As a result, we find the trial court erred in its application of the controlling legal standard. *E.W.* at ¶ 13.

{¶ 62} Second, we find the trial court's decision to be against the manifest weight of the evidence. The overwhelming bulk of the undisputed testimony at the custody hearing, and indeed the juvenile court's own factual findings, supported the conclusion that N.H. agreed to permanently relinquish sole custody of the children in favor of shared custody with T.H. Although differing from T.H.'s testimony on many points, N.H.'s testimony was inconsistent with her admitted prior actions, the uncontested documentary evidence in the record, the testimony of the guardian ad litem, and, in several instances, her deposition testimony.

{¶ 63} First, the undisputed conduct of the parties, both during and after their relationship, demonstrated an intent to share legal custody of the children. N.H. admitted at the custody hearing that she agreed, consistent with the terms of the co-parenting agreement, to give the children T.H.'s last name. Furthermore, N.H. agreed in the co-parenting agreement to determine the children's names by mutual consent with T.H. Indeed, some of the children were given names based on T.H. or T.H.'s family members' names.

{¶ 64} Additionally, it was undisputed that T.H. was present at the hospital for the children's births. T.H. was listed as J.C.H. and J.M.H.'s parent in the newspaper announcement of their births. In their baptismal program, J.C.H. and J.M.H. were described as the "twins of [T.H.] and [N.H.]." (Pltf.'s Ex. 21.) T.H. was recognized as the children's parent by their schools and doctors. N.H. testified the children called T.H. "Mom" or "Mutti" and considered her to be a parent. ( Tr. Vol. IV at 410-11.) As previously noted, the juvenile court found "persuasive in this case * * * that [N.H.] listed [T.H.'s] last name * * * as the children's last name on their birth certificates" and had not indicated whether she planned to change the children's last name. (Decision at 4.)

{¶ 65} Perhaps most tellingly, as the relationship ended, N.H. left the children with T.H. for days at a time while she was away from the house until she secured her own separate housing. Even after the relationship ended, N.H. agreed to share equal parenting time with T.H. Additionally, T.H. and the children traveled together outside of Ohio without N.H.

{¶ 66} In several instances, N.H.'s testimony was at odds with her prior words or admitted actions. At the custody hearing, N.H. testified regarding the decision to have children stating that "[p]rior to having the children, I selected a donor from California

Cryobank that had the qualities that were important to me, the quality such as a very clean medical history, health, someone who is tall and athletic, and a person who is musically inclined." (Tr. Vol. III at 386.)  However on cross-examination, N.H. was impeached by her deposition testimony:

[T.H.'s Counsel]: Yesterday it was your testimony that [T.H.] was not involved in selecting the donor for the artificial insemination process, correct?

[N.H.]: I made the final decision to select him, yes.

[T.H.'s Counsel]: I believe your testimony yesterday, at least what I have in my notes, was I selected a donor, clean medical history, musically inclined. Does that sound accurate?

[N.H.]: Yes.

[T.H.'s Counsel]: So you selected the donor?

[N.H.]: I purchased, selected, and had everything shipped, yes.

[T.H.'s Counsel]: Was it your joint decision to have kids, either the twins or [S.G.H.]?

[N.H.]: Yes.

[T.H.'s Counsel]: Do you recall when I took your deposition on September 28, 2017?

[N.H.]: Yes.

[T.H.'s Counsel]: And that deposition has been filed with this Court on November 9 of 2017.

* * *

I asked if you recalled your answer to my question when I was asking you about the artificial insemination, And what did you do in order to start the process? What was the process like?

What was your answer?

[N.H.]: Well, the process was –

[T.H.'s Counsel]:  No. I asked if you recalled your answer to my question at the deposition.
[N.H.]: And I did not recall.

[T.H.'s Counsel]: Now that you have it in front of you, what was your answer to my question?

[N.H.]: We researched the different cryobanks and decided upon a donor.

(Tr. Vol. IV at 432-35.)  Thus, N.H.'s testimony at the custody hearing that the selection of the donor was her sole decision was inconsistent with her prior deposition testimony. Importantly, her deposition testimony was consistent with both T.H.'s testimony and N.H.'s testimony at the custody hearing that it was their "joint decision" to have children. (Tr. Vol. IV at 433.)

{¶ 67}  On direct examination, N.H. testified it was her intention in executing the co-parenting agreement, her will, and medical power of attorney to provide a custodian for the children in the event of her death.  However, on cross-examination, N.H. acknowledged that the co-parenting agreement specified the rights of the parties to parent the children while N.H. was alive, instead of providing only for T.H.'s rights in the event of N.H.'s death, as she earlier claimed.  N.H. signed a durable power of attorney for medical authorization giving T.H. equal power to make medical decisions for the children from July 18, 2005, before the birth of the children, until December 11, 2017, after the initial day of testimony in the custody hearing, when she stated she revoked such power of attorney.

{¶ 68}  On direct examination, N.H. testified she paid all the bills for the residence and that she bore all the responsibilities of maintaining the home, raising the children, and paying the expenses related to childcare. However, on cross-examination, N.H. acknowledged T.H. paid the property taxes for the residence.  N.H. acknowledged that in her deposition she stated T.H. paid for the furniture in the house.  N.H. admitted it was not accurate to say that she alone was responsible for the household or yard work.  N.H. admitted that some of the expenses for the children were paid by T.H., including splitting payments for the children's school lunches and tuition for the prior school year.

{¶ 69}  N.H. acknowledged she had been in a relationship with T.H. but testified she made all major decisions about the care of the children. However, N.H. acknowledged that when asked at her deposition, "Do you believe that on a legal or a rights basis to the [children] you agree that you both are equal parents to the [children]," she responded, "I believe we, yes [sic]." (Tr. Vol. IV at 454-55.)  N.H. admitted that both she and T.H. were

responsible for disciplining the children. According to N.H., she and T.H. "both did strive to be loving, supportive, and caring for each child." (Tr. Vol. IV at 392.)[3]

{¶ 70} Indeed, the juvenile court appeared to disbelieve N.H.'s testimony by noting that, at the time of the births of J.C.H. and J.M.H., the parties had been in a committed relationship for several years and had purchased a home together. Additionally, at the time of the birth of S.G.H., the court noted the parties had been in a committed relationship for seven years. Furthermore, the court found N.H. and T.H. "shared in the responsibility of taking care of the children" by jointly paying for the children's expenses, in addition to "exercis[ing] their authority separately" in taking the children to appointments. (Decision at 6.)

{¶ 71} N.H. admitted that in accordance with the co-parenting agreement, "T.H. was very active in the [children's] lives, helped raise the children, took them places, attended conferences, preschool, I mean, very active in their lives." (Tr. Vol. IV at 456.) N.H. acknowledged that T.H. was home with the children full-time after 2011, including caring for S.G.H. while J.C.H. and J.M.H. were at school and N.H. was at work. N.H. acknowledged the children were equally bonded with her and T.H., as contemplated by the co-parenting agreement. Thus, like in *Rowell*, in which one of the parties' testimony was found to be "not compelling and often patently unbelievable," we find N.H.'s testimony lacks credibility and, therefore, does not constitute some competent, credible evidence in support of the trial court's decision. *Rowell* at ¶ 53.

{¶ 72} Next, we consider the documentary evidence in the record. In the co-parenting agreement, which was admitted into the record at the hearing, the parties specified that "[N.H.], biological parent, and [T.H.], non-biological parent" made the

---

[3] Recognizing that visitation and custody have differing meanings, we nonetheless note that N.H.'s own wishes regarding the case appeared at odds with her other testimony. At the custody hearing, N.H. testified as follows:

> It is in the best interest of my children to grant [T.H.] visitation rights to see them on a consistent basis. The plaintiff and my children have developed a loving bond over the years, and I would not want to see this bond broken. I do believe that visitation, utilizing the current 2-2-3 schedule with overnight stays at both parties'[] homes is acceptable.

> I do believe also that visitation is appropriate with my three children in order to maintain the bonds [T.H.] has established. Breaking these bonds would be detrimental and not in the best interest of my children.

(Tr. Vol. III at 402-03.)

agreement "to set out our rights and obligations regarding our child/children who will be born to us, hereafter referred to as 'our child/children.' " (Pltf.'s Ex. 2 at 1.) Indeed, throughout the document, the parties describe any future children as "*our* child/children," referring to T.H. and N.H. (Emphasis added.) (Pltf.'s Ex. 2.)

{¶ 73} Unlike in *Mullen*, in which all of the documents created by Mullen that gave Hobbs some custodial responsibilities not only were revocable but were, in fact, revoked by Mullen, the record in this case reflects that N.H. revoked only the medical power of attorney after the initial day of testimony at the custody hearing. Additionally, N.H. testified that it was not her intent in revoking the medical power of attorney to remove T.H.'s ability to get medical treatment for the children, but only to remove T.H.'s ability to make medical decisions on N.H.'s behalf. Furthermore, unlike in *Rowell*, where we found the parties had agreed to share custody even in the absence of any legal documents such as a power of attorney, guardianship or will, the documents in this case provide some evidence of the parties' agreement when considered with the other evidence. While the term "co-parenting," as used in the parties' co-parenting agreement, is not legally binding or conclusive evidence, it is some evidence supporting a finding of a shared custody agreement when considered in conjunction with the other evidence in the record, including the parties' words and conduct. *Mullen* at ¶ 22.

{¶ 74} Next, the testimony of Peterman, the guardian ad litem, supports finding N.H. had agreed to share custody with T.H. Peterman testified T.H. and N.H. did not have issues sharing responsibility of the children during the pendency of the case. The parties were agreeable to sharing equal custody and parental rights. The main issues prior to the custody hearing were the specific division of parenting time and responsibility for taking one of the children to sporting events.

{¶ 75} During Peterman's time as guardian ad litem, N.H. never expressed to Peterman that she desired sole custody of the children. Indeed, it was not until the custody hearing itself that Peterman learned N.H. sought sole custody of the children. When Peterman met with the parties on September 14, 2017, less than three months before the custody hearing, both N.H. and T.H. were agreeable to Peterman's recommendation that both parties should have equal access and rights to the children.

{¶ 76} Peterman recommended that custody be shared between T.H. and N.H. The children considered T.H. to be their mother. Furthermore, Peterman stated it would

negatively impact the children if T.H. was not awarded equal custody as the children considered T.H. and N.H. to be equal parents.

{¶ 77} Additionally, the juvenile court's finding regarding step-parent adoption is without support in the record. Specifically, the court found that N.H. "did not express whether she was for or against step-parent adoption, but her inaction can be considered as a denial of an extension of the agreement." (Decision at 6.) Nothing in the record, including N.H. and T.H.'s testimonies, indicates the parties' decision to not pursue adoption evinced an intent to prevent the sharing of legal custody.  Rather, the only testimony on the matter was T.H.'s, who testified as follows:

> [N.H.]: At any time was the co-parenting agreement filed in court?
>
> [T.H.]: It was not. But we did not know to do that.
>
> * * *
>
> [N.H.]: At any point after we were married on August 10, 2015, did you file for a stepparent adoption of [the children]?
>
> [T.H.]: No. But you and I thought that this would cover that. You and I did discuss it.
>
> [N.H.]: Did you ever begin the stepparent adoption process?
>
> [T.H.]: The stepparent adoption I never did because you and I thought this would cover it, [N.H.] We did have that discussion.
>
> * * *
>
> [N.H.]: Was the option of stepparent adoption available to you at that time after our marriage on August 10, 2015?
>
> [T.H.]: You and I didn't think we needed to, [N.H.] We did talk about it.

(Tr. Vol. II at 147-48.) Thus, T.H.'s testimony reflects she did not pursue step-parent adoption because the parties believed it was unnecessary given their co-parenting agreement.  N.H., on the other hand, did not refute T.H.'s testimony, and further did not express she was opposed to T.H. pursuing adoption of the children, but instead only testified that T.H. "took no steps to file for a stepparent adoption." (Tr. Vol. III at 402.)

T.H.'s unrebutted testimony cannot serve as the basis for the inference drawn by the juvenile court that N.H. did not agree to share custody rights.

{¶ 78} The totality of the record in this matter, including the credible testimony of the parties, the admitted documentary evidence, and the testimony of the guardian ad litem, overwhelmingly establishes that N.H., both during and after her relationship with T.H., consistently demonstrated, through her words and actions, her agreement to permanently share custody of the children with T.H. Therefore, weighing the totality of the evidence, considering all reasonable inferences and the credibility of the witnesses, as well as the trial court's seeming inconsistent weighing of the evidence, we find this to be the rare case where the court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Eastley* at ¶ 20.

{¶ 79} In conclusion, we find the trial court erred by applying the incorrect legal standard. Furthermore, we find the trial court's decision was against the manifest weight of the evidence. Accordingly, we sustain T.H.'s first and second assignments of error.

## VI. Third Assignment of Error

{¶ 80} In her third assignment of error, T.H. asserts the juvenile court erred by referring to the wrong filing date for the parties' joint stipulations when incorporating the same into its October 1, 2019 decision. Additionally, T.H. asserts the juvenile court erred by failing to incorporate the parties' July 23, 2019 agreed entry into its October 1, 2019 decision. Having sustained the first and second assignments of error, thereby reversing the juvenile court's October 1, 2019 decision, T.H.'s third assignment of error is rendered moot.

## VII. Conclusion

{¶ 81} Having sustained T.H.'s first and second assignments of error and rendered T.H.'s third assignment of error moot, we reverse the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, and remand this matter to that court to enter judgment in favor of T.H. on the complaint for shared custody of the children and for further proceedings consistent with this decision and law.

*Judgment reversed,*
*and cause remanded with instructions.*

KLATT and NELSON, JJ., concur.

_____