[Cite as *J.U. v. A.F.*, 2024-Ohio-4944.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

J.U.                                                            Court of Appeals No.  WD-23-061

      Appellee                                           Trial Court No.  2021 JF 0868

v.

A.F.                                                            **DECISION AND JUDGMENT**

      Appellant                                          Decided:  October 11, 2024

* * * * *

Laken L. Wise, for appellee.

Andrew R. Mayle and Benjamin G. Padanilam, for appellant

* * * * *

**ZMUDA, J.**

{¶ 1} Appellant, A.F., brings this appeal from the judgment of the Wood County
Court of Common Pleas, Juvenile Division, granting the "Renewed Motion for Legal
Custody" filed by appellee, J.U., and ordering reunification counseling between appellee
and minor child, Av.F. For the reasons that follow, the trial court's judgment is affirmed.

**Statement of the Case**

{¶ 2} This appeal arises from a custody lawsuit filed by A.F.'s ex-fiancée, J.U.
The lawsuit concerned A.F.'s minor biological daughter, Av.F, who was born on

November 15, 2012. On November 29, 2021, J.U. filed a "Verified Complaint to Establish Parental Rights and Responsibilities and Motion for Custody." This initiating pleading sought orders from the court relating to the custody of Av.F., as between J.U. and A.F.

{¶ 3} On December 29, 2021, A.F. filed a pleading captioned "Answer to Plaintiff's Complaint and Motion to Dismiss." J.U. filed an opposition, and A.F. filed a reply.

{¶ 4} On March 3, 2022, a magistrate's decision was filed recommending that A.F.'s request to dismiss the portion of J.U.'s complaint that requested orders as to parental rights and responsibilities be granted, and that A.F.'s request to dismiss the portion of J.U.'s complaint that requested custody-related orders be denied. No objections were filed. In a judgment entry filed on March 23, 2022, the trial court adopted the magistrate's recommendations.

{¶ 5} A guardian ad litem ("GAL") was appointed for Av.F., and the matter was set for an evidentiary hearing to be held on August 31, 2022.

{¶ 6} On August 8, 2022, J.U. filed a pleading captioned "Rule 41(A) Notice of Dismissal." This pleading requested that the pending matter be dismissed without prejudice. By order filed August 9, 2022, the court dismissed the matter without prejudice.

{¶ 7} On September 12, 2022, a pleading captioned "Renewed Motion for Legal Custody" was filed by counsel on behalf of J.U. This pleading, which requested an order for shared custody of Av.F. between J.U. and A.F. and/or visitation and companionship

2.

orders, was filed, consistent with the Wood County Juvenile Court ("WCJC") policy and local rules, under the original case number that was assigned at the initiation of the custody proceedings involving Av.F. J.U. filed a praecipe for service of the Renewed Motion as well as a Renewed Motion for Guardian ad Litem, which sought "re-appointment" of the GAL. Case management software showed a new "pending past guidelines" start date, Supreme Court reporting date, and case status date of September 16, 2022, and the trial court reported the newly refiled case to the Ohio Supreme Court. Personal service of the summons and refiled motion were effectuated on November 29, 2022, by which time A.F.'s attorney had already requested leave to file a motion for summary judgment.

{¶ 8} On November 30, 2022, a motion for summary judgment was filed on behalf of A.F. On January 19, 2023, the magistrate issued a decision recommending that A.F.'s motion for summary judgment be denied. A.F. filed objections. By order filed on February 27, 2023, the trial court found the objections not well-taken, formally adopted the magistrate's recommendations, and denied A.F.'s request for summary judgment.

{¶ 9} On April 13, 2023, the appointed GAL filed a pleading advising the trial court that the GAL's recommendations were in conflict with minor child Av.F.'s stated wishes. Thereafter, separate counsel was appointed for Av.F.

{¶ 10} The underlying matter proceeded to an evidentiary hearing before the magistrate on May 3 and May 4, 2023. Extensive testimony and exhibits were received. In addition, an in-camera interview with Av.F. was conducted by the magistrate on May 5, 2023.

3.

{¶ 11} A magistrate's decision filed on June 27, 2023, recommended that J.U.'s Renewed Motion for Legal Custody be granted; that J.U. be awarded shared custody of Av.F.; that J.U. and Av.F. participate in reunification counseling; that the parties be prohibited from talking disparagingly about one another; that the GAL remain appointed in this matter; and that a review hearing be set.

{¶ 12} A.F. filed objections on July 11, 2023, and a supplement to her objections on October 20, 2023. On November 1, 2023, J.U. filed a formal response opposing A.F.'s objections.

{¶ 13} In a judgment entry filed on November 17, 2023, the trial court denied A.F.'s objections and supplemental objections, and adopted in part and modified in part the recommendations contained in the June 27, 2023 magistrate's decision. After ordering that the Renewed Motion for Legal Custody was found well-taken and granted, and that J.U. was awarded shared custody of Av.F., the trial court further ordered that J.U. and Av.F. engage in reunification counseling with a counselor recommended by the GAL and that, at the reunification counselor's discretion, A.F. participate; that all parties cooperate with the reunification counseling; that if the reunification counselor believes Av.F.'s counseling with Kristen Shores or any other counseling which Av.F. is participating in is interfering with reunification efforts, the reunification counselor shall advise the court, the GAL, and the parties, and the court may issue orders as necessary; that the reunification counselor may have access to the trial court's decisions and reports from the GAL as deemed necessary; that J.U. and A.F. refrain from speaking about the other in a disparaging manner in the presence of Av.F., and that J.U. and A.F. not allow

4.

another person to do so in the presence of Av.F.; that the GAL remain on the case and have access to the reunification counselor as necessary; and that the matter be set for a review hearing in March 2024 before the magistrate.

{¶ 14} It is from the trial court's November 17, 2023 judgment entry that A.F. currently appeals.

### Statement of the Facts

### Hearing testimony

### A.F.

{¶ 15} A.F. testified that she began an intimate relationship with J.U. in 2005, while A.F. was engaged to be married to her fiancé, K.N. After marrying and becoming pregnant by K.N., A.F. continued the relationship with J.U. "on and off," while A.F. tried to work on her marriage.

{¶ 16} Sometime around 2007, A.F. left her husband and moved in with J.U. Living with the two women were A.F.'s son, C.N. and J.U.'s son, C.B. A.F. testified that she and J.U. functioned as parental figures to the two boys and that together they all "functioned as a family."

{¶ 17} After several years, A.F. decided that she wanted to have another child. When she communicated this desire to J.U., J.U. initially stated that she did not want another child.

{¶ 18} In 2012, A.F. became pregnant with Av.F. by artificial insemination with a donor sperm. A.F. testified that although J.U. did not sign the contract with the sperm bank, J.U. was part of the sperm donor selection, with other folks giving their input as

well. A.F. testified that she went online and narrowed the decision down to a few donors that she was interested in. When she had narrowed the pool to two potential donors, she let J.U. choose which donor to use.

{¶ 19} A.F. testified that after she became pregnant, J.U. would attend some ultrasound appointments and checkups with her. She further testified that at the time she and J.U. announced the pregnancy to A.F.'s family, they were "putting [them]selves out as a family already with the boys."

{¶ 20} A gender reveal party and baby shower took place at a home that A.F. and J.U. had purchased together. When Av.F. was born, J.U. was present and cut the umbilical cord. J.U. was not, however, listed on the child's birth certificate. Nor did J.U. ever adopt Av.F. or enter into a written contract with A.F. that would permanently confer any custodial rights to J.U. for Av.F. Further, there has never been any involvement by the sperm donor in Av.F.'s life.

{¶ 21} At the time of Av.F.'s birth, on November 15, 2012, A.F. wore a promise ring to symbolize her committed relationship with J.U. In addition, Av.F. was given J.U.'s last name. A short time later, A.F. changed her own last name to that of J.U. A.F. stated that she gave Av.F. J.U.'s last name, because she intended for J.U. "to be the other parent, stepparent possibly if [she and J.U.] got married." A.F. stated that she was moving into what she thought was going to be a marriage with J.U.

{¶ 22} A.F. and J.U. took Av.F. home, where they raised the child together until A.F. and J.U. "parted ways" in 2017. During the period that A.F. and J.U. were together, the two women shared joint bank accounts, and for a period J.U. functioned as a stay-at-

home mom to Av.F. A.F. testified that after Av.F. was born, she proposed to J.U. at Put-in-Bay. She also testified that she and J.U. never got married or participated in any type of commitment ceremony.

{¶ 23} When Av.F. was a baby, A.F. and J.U. shared the duties of feeding the child, changing her, and getting up to comfort her in the night. As Av.F. got older, she became involved in extracurricular activities, such as dance, swimming, and soccer. A.F. and J.U. shared the expenses for these activities, and both attended Av.F.'s games, competitions, and recitals.

{¶ 24} On an emergency contact form for kindergarten, A.F. listed J.U. as Av.F's other parent. And while Av.F. was in elementary school, J.U. received emails from the school that were sent to parents. In addition, J.U. attended some parent/teacher conferences.

{¶ 25} Throughout the years, A.F. and J.U. had an on again-off again relationship that A.F. described as "very toxic." But even during the break-up periods, J.U. maintained a "close-knit relationship" with Av.F. At such times, A.F. and J.U. had a visitation schedule during which Av.F. would spend every other weekend and "some Wednesdays" with J.U.

{¶ 26} A.F. testified that the family dynamic with J.U. ended when their relationship ended. She further testified that the relationship between Av.F. and J.U. became "uncomfortable" for Av.F. when J.U. started dating a man, and that soon after meeting the man, Av.F. stopped wanting to see J.U.

7.

{¶ 27} A.F. denied terminating contact between Av.F. and J.U. due to any of A.F.'s own feelings of jealousy or resentment toward J.U., and denied that the termination of Av.F. and J.U.'s relationship had anything to do with the termination of her own relationship with J.U. Instead, A.F. stated that she merely supports Av.F.'s choice not to have a relationship with J.U. When asked if she thinks that there would be some benefit to Av.F. having a relationship with J.U., A.F. answered, "At this point my belief is, no."

{¶ 28} Acknowledging that J.U. is the person she shared her life with for 16 years, A.F. testified that when she decided to have Av.F. during the period of her relationship with J.U., she chose to do so on her own.

{¶ 29} A.F. testified that since the fall of 2021 she repeatedly asked J.U. to stop contacting her and her children, but that J.U. continued to call, text, and e-mail the family, until, finally, A.F. called the police in January 2023.

{¶ 30} A.F. testified that she is physically and mentally healthy, and that she is earning over $300,000 a year as a regional director of neuropsychiatry for a company called Biogen. A.F. testified that she has no current plans to move out of Ohio.

**J.U.**

{¶ 31} J.U. testified that she and A.F. began an intimate relationship in March 2005, and that the relationship was maintained after A.F. got married, became pregnant with C.N., and finally left her husband. J.U. stated that she and her son moved in with A.F. and her son around 2009. She confirmed that she and A.F. held themselves out as a family to the public.

8.

**{¶ 32}** J.U. testified that she and A.F. decided together on Av.F.'s name. They gave Av.F. J.U.'s last name, because J.U. and A.F. were engaged at the time and were going to get married "eventually." J.U. stated:

> So, [A.F.] carrying the baby we felt it was good to give [Av.F] my last name to give me somewhat of the involvement since I'm non-bio mom. Then [A.F.] was in the process of taking my name. So we had the same family name.

**{¶ 33}** J.U. testified that A.F. asked her to marry her on two occasions. Once, when they moved in together in 2009, and a second time in July of 2014 at Put-in-Bay. J.U. testified that engagement rings were exchanged, and that after the second engagement they started looking at wedding venues and even purchased wedding dresses.

**{¶ 34}** J.U. acknowledged that, unlike A.F., she did not initially want any more children. She explained that she wanted to make sure that she and A.F. were "actually going to be established in a home, have a committed relationship to raise the three kids [they] already had before [they] brought another child into the world." J.U. stated that she became ready to have a child after she and A.F. bought their home together in June 2011.

**{¶ 35}** J.U. confirmed that she and A.F. were "torn between two" sperm donors, but then ended up picking one together. After Av.F. was born in November 2012, J.U. and A.F. sent out a combination birth announcement/Christmas with a picture of the whole family.

**{¶ 36}** J.U. testified that when Av.F. reached school age, J.U. would help enroll her, meet the teacher, and participate in activities as Av.F.'s mom. J.U. stated that even during periods in which she had broken up with A.F., her role in Av.F.'s life remained

9.

consistent over the years until the fall of 2021, when J.U. met and began dating another person. J.U. testified that her pursuing a relationship with someone else upset A.F., taking her "over the edge," and that "from that point forward Av.F. got put in the middle."

{¶ 37} J.U. introduced Av.F. to her new boyfriend, and Av.F. became upset. It was at this point that A.F. "started to throw out there that [J.U.] wouldn't see [Av.F.] anymore." It was J.U.'s impression that A.F. was trying to punish J.U. for "moving on."

{¶ 38} J.U. testified that since that time, she has repeatedly apologized and tried to make contact through e-mail. She asked many times to sit and talk with A.F., and she continued to send the children presents, gifts, and cards to let them know that she was still there and that she loved them and continued to want to coparent them. None of these attempts were well-received.

{¶ 39} J.U. testified that she was present and assisted in paying for Av.F.'s dance, swimming, basketball, volleyball, and T-ball activities. She also testified that she and A.F. always taught Av.F that she had "two mommies." On Mother's Day both women were recognized equally.

{¶ 40} In September of 2021, J.U. took Av.F. out of state to Florida for a family vacation that did not include A.F. A.F. was fully aware of, and gave her approval for, Av.F.'s participation in the trip.

{¶ 41} J.U. testified that the last time she saw Av.F. was on October 27, 2021, when A.F. and her ex-husband brought Av.F. to have dinner with her. At this point, she learned that A.F. was changing her last name from U. to F. She stated that Av.F. was "a little more cold and distant."

10.

{¶ 42} J.U. stated that her on again-off again relationship with A.F. and her visitation relationship with Av.F. started in 2017 and that both relationships "officially ended" in October 2021.

{¶ 43} J.U. testified that she is physically and mentally healthy, that she has no plans to move out of Ohio, and that she is willing to honor any court ordered visitation rights, and that even if the court did not award shared custody, she would still like companionship time with Av.F.

### Christie Shindorf

{¶ 44} Christie Shindorf testified that sometime between 2019 and 2020, she met A.F. at Shindorf's apartment complex, and that A.F. told her that the apartment complex was where Av.F.'s "other mom, [J.U.], lives."

### Marla Frankevic

{¶ 45} Marla Frankevic testified that she lived down the street from A.F. and J.U., and that she met the couple in the summer of 2011. She stated that her sons became friends with theirs, and that she attended A.F.'s baby shower. She described A.F. and J.U. as "both just the moms." The last time Frankevic saw Av.F. was in 2019, after A.F. and J.U. had moved out of their house.

### Anne Wielgopolski

{¶ 46} Anne Wielgopolski testified that she worked with J.U. since 2014, and that sometimes J.U. would pick Av.F. up from school and bring her into the office. She stated that "[i]t was, you know, the typical mom/daughter type of relationship."

11.

## Chelsea Cox

{¶ 47} Chelsea Cox testified that she is a friend of J.U.'s and that she dated J.U.'s cousin for about 11 years. She described J.U.'s and Av.F.'s relationship as a "[m]other/daughter relationship."

## Nicole

{¶ 48} Nicole testified that J.U. is her aunt A.F.'s ex-partner, and that she considered J.U. to be her aunt as well. She stated that as a teenager, she lived with J.U. and A.F. for a couple of months during the summer of 2013. She testified that she perceived the situation as a family unit between J.U. and A.F., and that both J.U. and A.F. were mothers to Av.F.

## C.B.

{¶ 49} J.U.'s son, C.B. testified about his day-to-day life with J.U. and A.F., and how he referred to A.F. as his second mother. He said that the relationship between himself and A.F. and Av.F. changed after he returned from Air Force tech training, around the time that J.U. told him that A.F. was essentially keeping Av.F. from her. He testified that his response to this news was to call A.F., and that A.F. had told him that she could not allow Av.F. to be in the "uncomfortable" situation of being around J.U. and the man that she was seeing at the time.

{¶ 50} When asked why he thought things had changed between A.F. and J.U., C.B. stated:

> [I]n my opinion [A.F.] was heartbroken at the fact that my
> mom had moved on and started seeing someone else and then
> essentially used the situation and used it to remove [Av.F.]

12.

from her. I feel like there's probably a lot of probably jealousy involved. A lot of just like – they didn't have the, you know, the most picture perfect relationship ever. So I feel like there was just a lot of bad feelings towards my mom, and this was her way of sort of getting back at her, or quote, unquote, winning or something.

**Eric**

{¶ 51} A.F.'s brother, Eric testified that when A.F. and J.U. announced A.F.'s pregnancy, A.F. stated that she and J.U. were very happy and wanted to raise a child together. He stated that it was pretty obvious that the child would have two mothers, and that the situation became even more clear in the succeeding years "because [A.F. and J.U.] generally acted as a couple," and because Av.F. referred to both women as mommy or mom.

**Ardis**

{¶ 52} Ardis testified that A.F. is her son-in-law's sister, and that she met J.U. approximately 15-16 years ago. Describing her understanding of the situation the day she found out that A.F. was pregnant with Av.F., Ardis testified:

> Well that [A.F.] was pregnant and that [J.U.] was excited and they were going to have this child together. And because they were already a family unit, we just were very thrilled that – it was a surprise, I won't lie…. But the child was going to be theirs. They were going to raise the child together.

{¶ 53} She recalled one Mother's Day when A.F. left the house to take Av.F. to see J.U. after explaining that Av.F. "gets to spend the other half of this day with her other mother. [J.U.]'s her mother too."

13.

**K.N.**

{¶ 54} A.F.'s ex-husband K.N. testified that Av.F. used to call him daddy all the time, but "everybody had to kind of say no, [Av.F.], he's not your actual dad." He testified that Av.F. now calls him by his first name. He further testified that he heard Av.F. call J.U. mom or mommy, but on those occasions no one would correct her.

**D.F.**

{¶ 55} A.F.'s father, D.F.. testified that J.U. always treated Av.F. "like she was her mother," and treated A.F.'s son "like a relative."

**Kristen Shores**

{¶ 56} Licensed independent social worker Kristen Shores testified that she started providing individual therapy to A.F. about two years ago, and then about year ago A.F. stopped her own therapy and asked Shores to work with Av.F., instead. According to Shores, Av.F. has been consistent in her opinion that "she would like to move forward from her relationship with [J.U.] and not have any connection with her at this time." Shores testified that she does not believe that her being Av.F.'s counselor after being A.V.'s counselor gives rise to any conflict of interest or bias in this case, despite the fact that she knew a lot about the relationship between A.F. and J.U. before she started counseling Av.F.

**Mimi Yoon**

{¶ 57} GAL Mimi Yoon testified that she has been a licensed attorney for 30 years and has been working as a GAL for 25 to 26 years. After meeting with the parties, visiting Av.F.'s school, and reviewing various documentary materials, Yoon currently

14.

recommends that J.U. and A.F. either engage in or continue to engage in individual counseling, and that J.U. and Av.F. participate in reunification counseling. She also recommends that J.U. have access to school records, e-mails, and parent/teacher conferences, as she did before. Yoon stated that "in all of the ways that really matter…[J.U.] has been the other mother in [Av.F.'s] life." Expounding on this thought, she stated:

> [T]he limitations have been genetics, biology, the inability for the parties to have married prior to 2015, and the tumultuous nature of their relationship over the years. I think in every other way that this is a family with two mothers. And I believe that that relationship should continue.
>
> However, given how fractured this family is at this point, and the lengthy period of time during which [Av.F.] and [J.U.] have had little to no contact, I don't think that it would be in [Av.F.'s] best interest to jump into the typical parent/child relationship with a typical schedule. That's why I'm recommending the reunification counseling.

{¶ 58} Looking at Av.F.'s kindergarten enrollment registration form, dated February 19, 2018, Yoon testified that J.U.'s name and contact information appears in the section for legal custodians only, and is separate and apart from the emergency contact section, which contains the name of A.F.'s parents.

{¶ 59} Yoon further testified that she spoke with the school counselor, who voiced concern that some of Av.F.'s statements sounded "scripted, as if the words had been given to [Av.F.]." When asked whether Av.F. seems like a child who has been influenced, Yoon answered:

15.

I would say that, yes, I believe that she's been influenced, but I can't say for sure that it has been such direct influence where [A.F.] is telling her what to think or how to express herself or what to say. But I would say that it's very clear how [A.F.] feels just through her language, through her body language, her approach. I mean, you know Av.F. told me that they saged the house to get all of the bad [J.U.] vibes out of the house. That sends a message to a child.

Yoon stated that in her own meetings with Av.F., the child was "consistent in that she forgives [J.U.], but doesn't want a relationship with her." She further stated:

[D]o I think that a child who is 8, 9, or 10 years old has the ability or maturity to make a determination about whether to continue a relationship such as the one she had with [J.U.], no…. I believe that to an extent [Av.F.] believes that [J.U.] put her relationship with [the man she was dating] ahead of her relationship with [Av.F.] at some point…..[But] I don't think the answer to that is to cut off the relationship or terminate the relationship.

According to Yoon, this case has similarities to parental alienation cases.

### In-camera interview with magistrate

{¶ 60} In her in-camera interview, Av.F. advised the magistrate that she did not wish to have a relationship with J.U.

### Trial court decision

{¶ 61} Regarding the question of whether A.F. had relinquished her right to sole custody in favor of shared custody with nonparent J.U., the trial court, in its November 17, 2023, judgment entry concluded the following:

From this court's objective review of the testimony and exhibits presented, it is clear that defendant contractually relinquished sole custody of [Av.F.] in favor of a shared custody arrangement between defendant and plaintiff. While

16.

there is no 'smoking gun' written document which would establish a clear date for when the relinquishment occurred, nonetheless, it is clear it did occur over the course of time by the conduct and legal decisions made by defendant and plaintiff. Defendant's suggestion that plaintiff was, in effect, little more than an ex-girlfriend/roommate with defendant and [Av.F.] while [Av.F.] was one years old, when [Av.F] was two years old, when [Av.F.] was three years old, when [Av.F.] was four years old, when [Av.F.] was five years old, when [Av.F.] was six years old, when [Av.F.] was seven years old and when [Av.F.] was eight years old – despite all the evidence presented as to nature and extent of plaintiff's and [Av.F.'s] relationship – much of it facilitated and encouraged by defendant – must be found not well taken.

The trial court further concluded that "the continuing shared custody agreement reached and exhibited over the course of nine years between [A.F.] and [J.U.] is in the best interest of [Av.F.], and that J.U. "would be a suitable person to provide for the care, training, and education of [Av.F.] as may be deemed necessary."

**Assignments of Error**

{¶ 62} On appeal, A.F. asserts the following assignments of error:

I.      The juvenile court erroneously ordered appellant [A.F.] to share custody of her daughter with appellee [J.U.] after [J.U.] dismissed her custody complaint before trial, which operated to deprive the court of jurisdiction.

II.     The juvenile court erroneously ruled that [A.F.] "contractually" relinquished her right to sole custody of her child in favor of a shared custody agreement with her ex-girlfriend, [J.U.].

III.    The trial court erroneously ruled that a shared custody

agreement was in the best interests of the child only after

erroneously (a) failing to give the requisite level of deference

to [A.F.'s] determinations as [Av.F.'s] fit parent (b) shifting

the burden of proof to [A.F.].

IV.    The trial court erroneously acted beyond the scope of its

statutorily defined jurisdiction when it awarded shared

custody to [J.U.] in an adversarial setting.

## Law and Analysis

### The trial court had jurisdiction in this case.

{¶ 63} A.F.'s first and fourth assignments of error assert the trial court's lack of jurisdiction in this case: first because J.U. voluntarily dismissed her original case, and second on the grounds that the juvenile court lacked subject matter jurisdiction to hear an adversarial custody claim brought by a "nonparent, nonrelative ex-girlfriend against a fit parent."[1]

### First Assignment of Error

{¶ 64} Citing *State ex rel. Walton v. Williams*, 2016-Ohio-1054, A.F. argues in her first assignment of error that J.U. "divested the trial court of jurisdiction" when she filed her Civ.R. 41(A)(1) motion to dismiss  -- and, when, on the basis of that motion, the trial

---

[1] We note that A.F. raised nearly identical arguments in her pursuit of a writ of prohibition through the Supreme Court of Ohio. The Supreme Court dismissed that matter without an opinion after granting a motion for judgment on the pleadings that was filed by the respondent trial court. *See State ex rel. Fischer v. Woessner*, 2024-Ohio-597.

18.

court ordered the matter dismissed -- and that, as a result of J.U.'s and the trial court's actions, the trial court lacked jurisdiction to rule on J.U.'s subsequently filed "renewed motion for legal custody." *See id.* at ¶ 16 ("In general, when …case has been voluntarily dismissed under Civ.R. 41(A)(1), the trial court patently and unambiguously lacks jurisdiction to proceed….").

{¶ 65} We agree that the original proceedings involving Av.F. were dismissed by J.U. without prejudice, as allowed by Civ.R. 41(A)(1). This means that the action was dismissed subject to being refiled. Consistent with the WCJC policy and local rules, the action was, in fact, refiled under the original case number on September 12, 2022, with the pleading captioned "Renewed Motion for Legal Custody."

{¶ 66} At the time the renewed motion was filed, Rule 7 of the Rules of Practice of the Juvenile Division of the Common Pleas Court of Wood County, Ohio provided as follows:

> All papers filed subsequent to the complaint shall be designated under this Court's case number and the name of the Judge.
>
> Upon the filing of a complaint or any other pleading or motion for which service of summons is required, sufficient copies shall be filed so that one copy may be served upon each party. The Clerk shall, upon request, furnish additional copies at the fee provided by law.
>
> Upon the filing of any motion or application, sufficient copies shall be filed so that one copy may be provided to the Judge or Magistrate.

19.

Thus, Local Rule 7 required that all papers, which included pleadings, filed subsequent to the original complaint be designated under the case number that was originally assigned. The procedure of using the same case number for a refiling that was used by the juvenile court in this case is also used by other jurisdictions. *See, e.g., C.H. v. O'Malley*, 2019-Ohio-4382, ¶ 17-18 (Six minutes after filing a Civ.R. 41(A)(1) notice of voluntary dismissal without prejudice, the child's biological father filed a new motion to determine custody, typing the same case number as the case number for the new motion, which was in accordance with the court's operating procedures; by dismissing and then refiling his application, he was found to have commenced new custody proceedings.).

{¶ 67} As indicated above, the "renewed motion" requested an order for shared custody of Av.F. between J.U. and A.F., and/or visitation and companionship orders. And in accordance with the local rule, J.U. filed a praecipe for service of the Renewed Motion as well as a Renewed Motion for Guardian ad Litem, which sought "re-appointment" of the GAL. Following J.U.'s compliance with the local rule, the WCJC case management system was properly updated, showing a new "pending past guidelines" start date, Supreme Court reporting date, and case status date of September 16, 2022, and, further, the trial court reported the newly refiled case to the Ohio Supreme Court. In light of these actions, we find that J.U.'s case was properly refiled, giving the juvenile court jurisdiction to hear J.U.'s renewed motion.

{¶ 68} A.F. complains for the first time on appeal that J.U.'s renewed motion failed to meet the requirements of Juv.R. 10(B)(3), which provides that a juvenile complaint must be made under oath. Pursuant to Juv.R. 22, however, an objection based

20.

on a defect in the complaint must be heard before the adjudicatory hearing by a pre-hearing motion. Juv.R. 22(D)(2). In raising the issue for the first time on appeal, A.F. failed to meet the time requirement set forth in Juv.R. 22, and, as a result, her objection is waived. *See In re Dukes*, 81 Ohio App.3d 145, 150 (where appellants raised Juv.R. 10(B)(3) defect for the first time at the adjudicatory hearing, objection was deemed waived). A.F.'s first assignment of error is therefore found not well-taken.

### Fourth Assignment of Error

{¶ 69} A.F. argues in her fourth assignment of error that "[t]he lower court erred when it failed to dismiss the case for lack of subject-matter jurisdiction[,] because the Ohio legislature did not empower juvenile courts with the ability to entertain an adversarial custody claim brought by a nonparent, nonrelative ex-girlfriend against a fit parent."

{¶ 70} A.F. makes this argument in spite of the Ohio Supreme Court's express holding in *In re Bonfield*, 2002-Ohio-6660, that, pursuant to R.C. 2151.23(A)(2), juvenile courts possess subject matter jurisdiction to determine the custody of any child not a ward of another court in actions brought by persons considered nonparents at law. *Id.* at ¶ 42-43; see also *Rowell v. Smith* ("*Rowell I*"), 2012-Ohio-4312, ¶ 14, quoting *Bonfield* at ¶ 43 ("R.C. 2151.23(A)(2)…grants juvenile courts exclusive original jurisdiction 'to determine the custody of any child not a ward of another court of this state.' This includes 'custodial claims brought by the persons considered nonparents at law.'"). Because *Bonfield* firmly establishes the trial court's jurisdiction to adjudicate the child

21.

custody dispute between A.F. and J.U., A.F.'s fourth assignment of error is found not well-taken.

**The trial court did not err in its determination of parental rights.**

{¶ 71} Appellant argues in her second assignment of error that the trial court erroneously ruled that A.F. "contractually" relinquished her right to sole custody of Av.F in favor of a shared custody agreement with J.U. And she argues in her third assignment of error that the trial court erroneously ruled that a shared custody agreement was in the best interests of Av.F., when it failed "to give the requisite level of deference to [A.F.'s] determinations as [Av.F.'s] fit parent and when it "shift[ed] the burden of proof" to A.F. As these two assignments of error involve overlapping issues, they will be considered together in this analysis.

**Applicable Law**

{¶ 72} "The United States Supreme Court has stated that the right to raise one's children is an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 157, citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Although "the parents' right to custody of their children is paramount to any custodial interest in the children asserted by nonparents," "[a] parent's right to make decisions concerning the care, custody, and control of his or her children…is not without limits." *In re Mullen*, 2011-Ohio-3361, ¶ 11. For example, "a parent may voluntarily share with a nonparent the care, custody, and control of his or

22.

her child through a valid shared-custody agreement." *Id.*, citing *In re Bonfield,* 2002-Ohio-6660, at ¶ 50, R.C. 2151.23(A)(2).

{¶ 73} "The essence of [a shared-custody] agreement is the purposeful relinquishment of some portion of the parent's right to exclusive custody of the child." *Id.* Such an agreement "recognizes the general principle that a parent can grant custody rights to a nonparent and will be bound by the agreement." *Id.,* citing *Bonfield* at ¶ 48, citing *Masitto v. Masitto*, 22 Ohio St.3d 63, 65 (1986). (Additional citation omitted). A parent may enter into a voluntary custody sharing agreement through words and conduct. *Id.* at ¶ 14; *see also T.H. v. N. H.*, 2021-Ohio-217, ¶ 41 (10th Dist.).

{¶ 74} "A valid shared-custody agreement is reviewed by the juvenile court and is an enforceable contract subject only to the court's determinations that the custodian is 'a proper person to assume the care, training, and education of the child' and that the shared-legal-custody arrangement is in the best interests of the child." *Mullen* at ¶ 11, citing *Bonfield* at ¶ 48, 50.

### Evidentiary Standards and Standard of Review

{¶ 75} In general, "[a] trial court has broad discretion in proceedings involving the care and custody of children. *Mullen* at ¶ 1. "Whether a parent has voluntarily relinquished the right to custody is a factual question to be proven by a preponderance of the evidence." *Id.* Similarly, "whether a parent, through words and conduct, has agreed to share legal custody with a nonparent is also a question of fact." *Id.*

{¶ 76} "[T]he determination of whether a 'parent relinquishes rights to custody is a question of fact which, once determined, will be upheld on appeal if there is some

23.

reliable, credible evidence to support the finding.'" *Mullen* at ¶ 15, quoting *Masitto* at 66.

"Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." *Bechtol v. Bechtol,* 49 Ohio St.3d 21 (1990), syllabus. And where the juvenile court's determination is "supported by the evidence and [is] not clearly against the manifest weight of the evidence," a reviewing court "must affirm." *Mullen* at ¶ 23.

{¶ 77} "'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other…. Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief."'" (Emphasis omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed. 1990). "The phrase 'some competent, credible evidence'… presupposes evidentiary weighing by an appellate court to determine whether the evidence is competent and credible." *Id.* at ¶ 15. Thus, in reviewing a judgment under the manifest weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20. "Under this standard, a court of appeals must make every reasonable presumption in favor of the juvenile court's findings of fact and judgment." *T.H.,* 2021-

24.

Ohio-217, at ¶ 48, citing *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3.

{¶ 78} "'Whether the trial court applied the correct legal standard is a legal issue that we review de novo.'" *E.W. v. T.W.*, 2017-Ohio-8504, ¶ 13 (10th Dist.), quoting *Martin v. Mahr Machine Rebuilding*, 2017-Ohio-1101, ¶ 4 (11th Dist.). (Additional citations omitted.)

## Second Assignment of Error

{¶ 79} A.F.'s second assignment of error concerns whether A.F.'s conduct with nonparent J.U. created an agreement for permanent shared custody of A.F.'s child, Av.F. If there is no such contract, then A.F. retains all parental rights; but if there is such a contract, then the contract is enforceable if (1) J.U. is a suitable custodian and (2) the shared-custody arrangement is in Av.F.'s best interest. *See Mullen* at ¶ 12.

{¶ 80} In assessing whether a parent had voluntarily relinquished sole custody of a child to the benefit of a nonparent, the Supreme Court of Ohio in *Mullen* cited a variety of factors that were considered by the juvenile court in that case, including that: (1) the parties had planned for the pregnancy together, (2) the nonparent was present at the child's birth, (3) the nonparent's name appeared on a ceremonial birth certificate, (4) the parties jointly cared for the child, (5) the parties held themselves out and acted like a family, (6) the parent's will named the nonparent as the child's guardian, and (7) the parent executed a general durable power of attorney and a health-care power of attorney giving the nonparent the ability to make school, health, and other decision of the child. *Id.* at ¶ 16. Also considered were: (1) the fact that all of the documents created by the

parent that gave the nonparent some custodial responsibilities were both revocable and, ultimately, revoked, (2) the parent's statement that she did not intend to relinquish sole custody of the child in favor of shared custody with the nonparent, and (3) the fact that the parent had consistently refused to enter into or sign any formal shared-custody agreement when presented with the opportunity to do so. *Id.* at ¶ 17. In the face of this conflicting evidence, the juvenile court commented that a writing of the agreement between the parties would have been "instructive and preferred to determine whether a contractual relinquishment was made and how much custody was relinquished." *Id.*

{¶ 81} The juvenile court also considered the role of the child's father in determining whether the parent permanently relinquished partial legal custody rights. There, unlike in the current case, the father had regular contact with the child, was listed on the child's official birth certificate, and had formally acknowledged paternity. *Id.* at ¶ 18.

{¶ 82} On the conflicting and disputed evidence, the juvenile court concluded that there was reliable, credible evidence that the parent's conduct did not create an agreement to permanently relinquish sole custody of her child in favor of shared custody with the nonparent. *Mullen* at ¶ 19. On appeal, the appellate court agreed that "taken as a whole," reliable, credible evidence supported the juvenile court's findings. *Id.* Thereafter, the Ohio Supreme Court concluded that because the holdings of the juvenile and appellate courts were supported by the evidence and were not clearly against the manifest weight of the evidence, they were necessarily affirmed. *Id.* at ¶ 23.

26.

**{¶ 83}** Since *Mullen*, several other Ohio courts have used the factors and discussion in *Mullen* to determine custody as between a biological parent and nonparent arising from same-sex relationships. In *Rowell v. Smith* ("*Rowell II*"), 2013-Ohio-2216 (10th Dist.), the Tenth District Court of Appeals affirmed the trial court's award of shared custody to the nonparent on the grounds that there was some reliable, credible evidence to support the trial court's determination that the parent, through words and conduct, agreed to share legal custody with the nonparent. *Id.* at 54.

**{¶ 84}** At the outset of its analysis, the appellate court noted the trial court's express finding that the parent's trial testimony suggesting that the nonparent was "merely a roommate that looked after [the child] from 3:30 pm to 5:30 pm on weekdays" was not credible. *Id.* at ¶ 50-51. Another factor that was considered was that that the nonparent equally participated with the parent in the planning and birth of the child -- including the selection of a donor, assisting with the artificial insemination procedure, attending all pre-natal visits, attending parenting and Lamaze classes, being present throughout labor and delivery, cutting the umbilical cord, staying at the hospital, and, eventually, bringing them home. *Id.* at ¶ 51. Also noted was the parent's "accession to and active fostering of the formation, establishment, and growth of a parental relationship" between the nonparent and the child, including living in a single family household for the child's first five years, the nonparent's assumption of parental obligations, and taking significant, equal responsibility for the child's care, education, and development, and contributing financially with no expectation of financial compensation. *Id.*

27.

**{¶ 85}** Still other factors included that the parties jointly (1) selected doctors and daycare providers, (2) attended all appointments and parent-teacher conferences, and (3) celebrated holidays. *Id.* at ¶ 52. It was also determined that neither party assumed the role of primary caretaker of the child until the parent cut the nonparent out of the child's life when the relationship failed. Finally, it was noted that the nonparent was listed as a "parent" on the child's daycare forms and "co-parent" on the child's pediatric forms, and that the child's pediatrician and daycare knew both parties as "mom" and equal parents. *Id.*

**{¶ 86}** In *T.H. v. N.H.*, 2021-Ohio-217 (10th Dist.), the Tenth District Court of Appeals reversed the juvenile court's decision designating the biological parent as the sole legal custodian of the children. In that case, the appellate court found that the trial court erred in its application of controlling precedent and, further, that the trial court's decision was against the manifest weight of the evidence. Concluding that the "overwhelming bulk of the undisputed testimony at the custody hearing, and indeed the juvenile court's own findings, supported the conclusion that [the biological parent] agreed to permanently relinquish sole custody of the children in favor of shared custody with [the nonparent]," the appellate court summarized the evidence in favor of an intent to share legal custody as follows:

> First, the undisputed conduct of the parties, both during and after their relationship, demonstrated an intent to share legal custody of the children. [The biological parent] admitted at the custody hearing that she agreed, consistent with the terms of the co-parenting agreement, to give the children [the nonparent's] last name. Furthermore, [the parent] agreed in the co-parenting agreement to determine the children's names

28.

by mutual consent with [the nonparent]. Indeed, some of the children were given names based on [the nonparent] or [the nonparent's] family members' names.

Additionally, it was undisputed that [the nonparent] was present at the hospital for the children's births. [The nonparent] was listed as [the children's] parent in the newspaper announcement of their births. In their baptismal program, [the children] were described as the "twins of [the nonparent] and [the parent]." … [The nonparent] was recognized as the children's parent by their schools and doctors. [The parent] testified the children called [the nonparent] "Mom" or "Mutti" and considered her to be a parent…. As previously noted, the juvenile court found "persuasive in this case * * * that [the parent] listed [the nonparent's] last name * * * as the children's last name on their birth certificates" and had not indicated whether she planned to change the children's last name….

Perhaps most tellingly, as the relationship ended, [the parent] left the children with [the nonparent] for days at a time while she was away from the house until she secured her own separate housing. Even after the relationship ended, [the parent] agreed to share equal parenting time with [the nonparent]. Additionally, [the nonparent] and the children traveled together outside of Ohio without [the parent].

*Id.* at ¶ 62-65.

{¶ 87} Next, the appellate court considered instances in which the parent's testimony was "at odds with her prior words or admitted actions," including testimony (1) that the nonparent was not involved in selecting the donor for the artificial insemination process, (2) that certain documentation was intended to provide custody rights to the nonparent only in the event of the parent's death, and (3) that the parent paid all the bills for the residence and that she bore all the responsibilities of maintaining the home, raising the children, and paying the expenses related to childcare. *Id.* at ¶ 68.

29.

**{¶ 88}** The appellate court considered testimony wherein the parent acknowledged that she and the nonparent were equal parents to the children, and that both strove to be loving, supportive, and caring for each child. *T.H. v. N.H.* at ¶ 69. The court also noted that,

> at the time of the births of [the children], the parties had been in a committed relationship for several years and had purchased a home together. Additionally, at the time of the birth of [a third child] … the parties had been in a committed relationship for seven years. Furthermore, … [the parent] and [the nonparent] 'shared in the responsibility of taking care of the children' by jointly paying for the children's expenses, in addition to 'exercis[ing] their authority separately' in taking the children to appointments.
>
> [The parent] admitted that in accordance with the co-parenting agreement, '[the nonparent] was very active in the [children's] lives, helped raise the children, took them places, attended conferences, preschool, I mean, very active in their lives.' … [The parent] acknowledged that [the nonparent]. was home with the children full-time after 2011, including caring for [one child] while [the other two children] were at school and [the parent] was at work. [The parent] acknowledged the children were equally bonded with her and [the nonparent], as contemplated by the co-parenting agreement.

*Id.* at ¶ 70-71. Thus, the appellate court found that the parent's testimony lacked credibility and, therefore, did not constitute some competent, credible evidence in support of the trial court's decision. *Id.* at ¶ 71.

**{¶ 89}** In the instant case, the trial court, applying the law set forth in *Mullen* and looking to the factors that were considered in *Mullen, Rowell II,* and *T.H. v. N.H.,* concluded that A.F. relinquished her right to sole custody of Av.F. in favor of a shared custody arrangement with J.U. Among the evidence considered was evidence that:

- The plaintiff and defendant planned and paid for defendant's pregnancy with [Av.F.] jointly. The plaintiff and defendant jointly and actively participated in the selection of the sperm donor resulting in the defendant's pregnancy with [Av.F.].

- Plaintiff and defendant jointly held a baby shower and a gender reveal party with relatives and friends.

- The plaintiff was present at [Av.F.'s] birth and cut the umbilical cord.

- In the case at bar, [Av.F.] was actually legally given the last name of the plaintiff … by agreement of the parties after birth. This name appeared on [Av.F.'s] birth certificate for roughly nine years. Defendant testified this was done due to the fact the defendant believed she and the plaintiff were moving into a committed, long-term relationship. It was only after the parties separated and during the pendency of the ongoing contested proceedings that the defendant legally changed [Av.F.'s] last name to the defendant's last name….

- A careful review of the testimony and evidence establishes both the plaintiff and defendant jointly cared for [Av.F.] in all facets of [Av.F.'s] life for literally years – whether it be via newborn care at all hours of the day, assisting with medical appointments, involvement with extracurricular activies; and providing for the general support of [Av.F.].

- The testimony and exhibits establish [Av.F.] and defendant clearly regarded plaintiff as a mother figure for [Av.F.] by words and conduct.

- Defendant herself testified that she and plaintiff were holding themselves out as a family unit. Defendant's actions, particularly in [Av.F.'s] early years, support defendant's own statements. Further, multiple witnesses testified as to the family unit nature of the relationship between plaintiff, defendant, and [Av.F.] over a significant period of time.

- Both plaintiff and defendant described their ongoing relationship after [Av.F.'s] birth as, at times, 'toxic' or 'on-again, off-again.' It is noteworthy that until the "final" separation of plaintiff and defendant in 2021, during periods of time when plaintiff and defendant may be having disagreements or were separated, [Av.F.] continued to have ongoing contact with the plaintiff at times through the use of agreed upon visitation or contact.

- There was a variety of evidence and exhibits presented relative to the existence, or lack thereof, of written documents between the parties relative to their intent as to custody of [Av.F.]. It is undisputed that there was no executed written, formal shared custody agreement between plaintiff and defendant. However, as indicated, [Av.F.] was legally given the plaintiff's last name following [Av.F.'s] birth and utilized plaintiff's last name – in all facets of [Av.F.'s] life for over the first nine years of [Av.F.'s] life. This is a significant legal decision made by the parties – and maintained by the parties – for years. In addition, evidence was presented that plaintiff was given access – in writing – to [Av.F.] for school purposes similar to that provided to a parent or guardian. While there was testimony surrounding a number of estate planning documents executed by the defendant …, which do not reference plaintiff, it is noteworthy all of these estate planning documents were filed after the separation of plaintiff and the defendant and after the defendant's decision to terminate [Av.F.'s] contact with plaintiff.

{¶ 90} Upon our review of the record, we conclude that the record contains "some reliable, credible" evidence, as required by *Mullen*, to support the trial court's determination that A.F. through words and conduct, agreed to share legal custody with J.U.

{¶ 91} Arguing against this conclusion, A.F. argues that because she is a "fit" parent, her determinations surrounding the care, custody, and control of her child are

32.

owed "extreme deference." As stated by the appellate court in *T.H. v. N.H.*, however, a parent's suitability "is not a factor for the determination of whether the parties had an agreement to share legal custody." *Id.* at ¶ 61. In addition, the trial court expressly relied on *Mullen*, which includes an acknowledgement of a parent's "constitutionally protected due process right to make decisions concerning the care, custody, and control of their children" and that such right is "paramount to any custodial interest in the children asserted by nonparents" -- but which also recognizes that such right is "not without limits." *Mullen* at ¶ 11.

{¶ 92} Next, A.F. argues that any finding that she purposefully entered into a shared custody arrangement permanently relinquishing her right to sole custody of her child is against the manifest weight of the evidence. To the contrary, the trial court concluded, and this court agrees, that, consistent with *Mullen*, *Rowell II,* and *T.H. v. N.H,* A.F., through her words and conduct, entered into a voluntary (and permanent) custody sharing agreement with J.U.

{¶ 93} Citing *Mullen,* A.F. next points out that "coparenting" "is not synonymous with an agreement by the biological parent to permanently relinquish sole custody in favor of shared legal parenting." *Id.* at ¶ 22. While true, A.F. points to no specific evidence of "coparenting" in the record. Even if she did, *Mullen* makes clear that any use of the term by the parties, together with other evidence, "may indicate that the parties shared the same understanding of its meaning and may be considered by the trial court in weighing all the evidence." *Id.*

33.

{¶ 94} A.F. States that "conspicuously absent from the trial court's decision is any mention of the fact that when [J.U.] presented [A.F.] with the opportunity to create a written custody agreement, [A.F.] declined to do so." At the hearing, A.F. testified that this "opportunity to create a written custody agreement" -- described by J.U. as her "last attempt" before engaging an attorney -- was presented by J.U. in a "threatening" manner. As this "opportunity" clearly came after the parties had separated and after A.F.'s decision to terminate Av.F.'s contact with J.U., we do not think that the trial court erred in failing to highlight its existence.

{¶ 95} A.F. further complains that the trial court "paid no attention to the steps towards permanently ceding custody that [A.F.] did *not* take" -- such as marrying J.U., executing a will or power of attorney giving J.U. any sort of binding legal decision-making power over Av.F., or entering into a written shared-custody agreement. (Emphasis added.) Even taking all of these factors into consideration, given all of the other evidence contained in the record, we do not find that the trial court clearly lost its way or created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *See Eastley*, 132 Ohio St.3d 328, at ¶ 20.

{¶ 96} Finally, A.F. claims that the trial court erred in finding the existence of a shared-custody agreement, where "the basic elements of a contract" – such as an offer, an acceptance, contractual capacity, consideration, a manifestation of mutual assent, and legality of object and of consideration – were not shown. As indicated above, however, "[a] valid shared-custody agreement is reviewed by the juvenile court and is an enforceable contract subject only to the court's determinations that the custodian is a

34.

'proper person to assume the care, training, and education of the child' and that the shared legal-custody arrangement is in the best interests of the child." *Rowell II*, 2013-Ohio-2216 at ¶ 30, citing *Mullen* at ¶ 11. There is no mention of the applicability of basic contract law to shared custody agreements, whose focus, ultimately, is not on the parties, but rather on the best interest of the child. Appellant's second assignment of error is found not well-taken.

## Third Assignment of Error

{¶ 97} Looking to A.F.'s third assignment of error, we must next determine whether the shared-legal-custody arrangement is in Av.F.'s best interest. *Mullen* at ¶ 11, citing *Bonfield* at ¶ 48, 50. In this case, the magistrate dedicated over five pages of the decision to a recitation of the evidence applicable to the best interest determination, and, in conclusion, determined that shared custody was in Av.F.'s best interest. As part of the trial court's independent review, it noted, among other things:

- The plaintiff is desirous of reunifying with [Av.F.].

- The defendant testified she supports "[Av.F.'s] wishes" that [Av.F.] have no contact with the plaintiff. In effect, the defendant seems to be placing the entire decision on whether to allow [Av.F.] to have a relationship with plaintiff on [Av.F.] – a now 11 year-old girl caught in the middle of an extremely unfortunate dispute among adults. From the court's review of the evidence, the court is skeptical of defendant's assertion that she would be supportive of a relationship between [Av.F.] and plaintiff should [Av.F.] desire to have that relationship.

- In her in camera interview, [Av.F.] advised the magistrate she did not wish to have a relationship with the plaintiff.

35.

- The exact reason for [Av.F.'s] desire to effectively terminate her relationship with plaintiff remains unclear. The evidence presented did establish that over the years [Av.F] had observed the on again, off again, nature of the relationship between the plaintiff and defendant and, at times, the arguments that ensued. However, over a significant period of time, [Av.F.] was able to maintain a relationship with both the plaintiff and the defendant – as do many children as conflicts engulf their family units. One apparent "tipping point" occurred when [Av.F.] was introduced to a new boyfriend of plaintiff and the circumstances surrounding that introduction. Upon review of the testimony and actual evidence of the event and actions thereafter, the court agrees with the guardian ad litem's assessment that the actual circumstances behind [Av.F.'s] introduction to plaintiff's then new boyfriend do not seem to warrant the extreme step ultimately taken by defendant in effectively removing plaintiff from [Av.F.'s] life completely after this introduction – even if done in the context of "protecting [Av.F.'s] wishes" and protecting "defendant's parental rights."

- [Av.F.'s] guardian ad litem – an experienced guardian ad litem…testified and recommended that [Av.F.] and plaintiff engage in reunification counseling in an effort to determine whether and under what circumstances reunification could occur. The guardian ad litem expressed frank concerns over actions or inactions which could be categorized as, or be found similar to, 'parental alienation' on the part of defendant.

- The testimony does raise issues surrounding the degree of influence the defendant has upon [Av.F.] as it relates to any future relationship between [Av.F.] and plaintiff.

…

- From birth until roughly late summer or fall of 2021, [Av.F.] had an ongoing relationship with plaintiff. Any objective review of the actual evidence presented at trial … leads to the conclusion the relationship between [Av.F.] and plaintiff during this period of time was similar to that found between a mother and daughter.

- At the express direction of the defendant – purportedly to further the wishes of [Av.F.] alone – plaintiff has had no interaction with [Av.F.] since October 27, 2021.

- [Av.F.] further had significant, positive interaction with plaintiff's son until the late summer or fall of 2021. There has been little interaction between [Av.F.] and plaintiff's son since the decision of the defendant to prohibit plaintiff from having contact with [Av.F.]

  …

- There were no substantive issues raised surrounding [Av.F.'s] adjustment to plaintiff's home or community during periods of time [Av.F.] was with plaintiff.

  …

- From its review of the complete testimony of [Av.F.'s] counselor, the court shares the concern raised within the Magistrate's Decision surrounding the weight to be given [Av.F.'s] counselor's testimony. [Av.F.'s] counselor initially was the defendant's individual counselor. In this role, [Av.F.'s] counselor addressed the defendant's relationship with the plaintiff. [Av.F.'s] counselor acknowledged that she "knew a lot about" the relationship between plaintiff and defendant at the time she began counseling [Av.F.]; acknowledged that defendant had advised the counselor that [Av.F.] was "stressed;" and further acknowledged that [Av.F.] actually came into a "couple of" the defendant's own counseling sessions with the counselor. Despite this, [Av.F.'s] counselor testified she carried no bias into her counseling with [Av.F.]. Given the circumstances, the court finds the blanket opinion of [Av.F.'s] current (and defendant's past) counselor that re-unification counseling with an independent counselor will not work, not compelling or dispositive.

- The testimony and exhibits presented make it clear that there has been significant turmoil in the lives of plaintiff and defendant which, unfortunately, has directly impacted [Av.F.]….Coupling this emotional turmoil with facts such as the defendant's admission that she (the defendant) has been discussing the underlying proceedings with [Av.F.] or that [Av.F.'s] current counselor had been counseling the defendant as to relationship issues between the defendant and plaintiff, creates a strong suggestion of direct or indirect

inappropriate influence being exerted on now eleven year old [Av.F.] by the defendant.

{¶ 98} After determining from its independent review of the evidence that J.U. would be a suitable person to provide for the care, training, and education of [Av.F.], the trial court further concluded that it is in [Av.F.'s] best interest to re-engage the shared custody agreement in a slow and deliberate process, with ongoing court review and modification as may be necessary. The court found the magistrate's recommendation to attempt reunification counseling reasonable and in [Av.F.'s] best interest, as it would allow for an objective, neutral professional to speak with [Av.F.], J.U. and A.F. as necessary, and would help to "guide the parties forward."

{¶ 99} The trial court specified that its recommendation does not turn over the decision-making to the reunification counselor or unnecessarily prolong this matter. Rather, the court opined that "it is best to allow an independent counselor to assess the situation in the context of the legal relationships now being decided herein; report back to the parties and court; and to then allow the court to make additional orders, if necessary, as to how best to proceed for [Av.F.]. Stated otherwise, reunification was determined to be best under the circumstances, and the trial court is to review the status of the counseling as appropriate. It is not, as A.F. suggests, an "implicit finding that the then-present record did not support shared custody" that "shifted the burden away from [J.U.]."

{¶ 100} In this assignment of error, A.F. once again argues that because she is a "fit' parent, her determinations surrounding the care, custody, and control of her child are

38.

owed special weight or "extreme deference." As stated above, however, a parent's suitability "is not a factor for the determination of whether the parties had an agreement to share legal custody." *T.H.*, 2021-Ohio-217, at ¶ 61. Likewise, a finding of parental fitness does not require a court to effectively disregard all other evidence and to simply follow a parent's wishes when it comes to determining whether enforcement of a shared custody agreement would be in the child's best interests. *See, e.g.,* R.C. 3109.04(F) (when allocating parental rights and responsibilities, the wishes of the child's parents regarding the child's care is a factor to be considered in determining the best interest of a child). In this case, A.F.'s wish -- which was to support her daughter'*s* decision not to have contact with J.U. -- was a factor that was considered by the trial court. Again, a parent's constitutionally protected right to make decisions concerning the care, custody, and control of their children is "not without limits." *Mullen* at ¶ 11. Accordingly, appellant's third assignment of error is found not well-taken.[2]

---

[2] In rendering this decision, we are sensitive to the fact that Av.F. was born into J.U. and A.F.'s committed but non-marital relationship some two and a half years before the United States Supreme Court recognized in *Obergefell v. Hodges*, 576 U.S. 644, that same-sex couples must be permitted to marry "on the same terms and conditions as opposite-sex couples." *Id.* at 675-676. In Ohio, marriage establishes a parent-and-child relationship between a consenting same-sex spouse of a married woman and a child conceived by the married woman as the result of artificial insemination. *See In re L.E.S.*, 2024-Ohio-165, ¶ 21-22 (1st Dist.); R.C. 3111.95 (A). This parent-and-child relationship gives rise to parental rights, such as the right to custody, but also to parental responsibilities, such as the obligation to provide child support. *See, e.g., Jackson v. Jackson*, 137 Ohio App.3d 782 (2d Dist. 2000).

In the instant case, J.U. fails to cite, and this court's research has failed to reveal, any cases addressing the question of parental responsibilities that might reasonably be owed by a non-parent party within the context of a valid -- and "permanent" -- shared-custody agreement.

39.

**Conclusion**

{¶ 101} For all of the foregoing reasons, the judgment of the Wood County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Gene A. Zmuda, J.                          _____
                                                              JUDGE

Charles E. Sulek, P.J.

                                                   _____
Mark C. Miller, V.J.                                      JUDGE
CONCUR.

                                                   _____
                                                              JUDGE



Judge Mark C. Miller, Third District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.